JOHN C. McLEMORE *et al.* *v.* CHARLESTON & MEMPHIS RAILROAD CO. *et al.*

*(Jackson,* April Term, 1902.)

1. **DEEDS OF CONVEYANCE.** Rights under conditions surrendered by deed of relinquishment.

Where a landowner conveyed a tract of land to a railroad company by deed containing a condition requiring the railroad company to construct and build, within a reasonable time, a certain lateral railroad, after which it became apparent that the railroad company could never construct the said lateral railroad line; whereupon the said tract of land was partitioned between said conveyor and the successor in ownership of the said railroad company, by execution of partition deeds, the conveyor's said partition deed divested out of him all right in the tract of land so conveyed by him, whatever might have been his rights under the original deed containing such conditions, for failure to construct said road, had he asserted such rights. (*Post, pp.* 644-656.)

2. **SAME.** Right of way is an easement which may be lost by abandonment or surrender.

The conveyance of a right of way to a railroad company through the lands of the grantor operates to convey an easement therein only, and the fee remains in the grantor; and such easement may be lost by abandonment or voluntary surrender to the owner. (*Post, pp.* 657-658.)

Cases cited and approved: Railroad v. Telford, 89 Tenn., 293; Railroad v. Geisel, 119 Ind., 77; Jones v. Van Bochove, 103 Mich., 98; Railroad v. Frost, 147 Mass., 121; Flaten v. Moorehead, 51 Minn., 518; Williams v. Railroad, 50 Wis., 71; Robinson v. Railroad, 59 Vt., 426.

3. **SAME.** Extrinsic evidence is inadmissible to vary language of judicial decree and deed, when.

Extrinsic evidence is inadmissible to contradict or vary the language and recitals of a deed of conveyance of land made under a judicial decree as well as the legal import thereof, which have been accepted and acted upon by the purchaser of the land and not contradicted or denied by the former owner. (*Post, pp.* 658-661.)

4. **SAME.** Fee in right of way passes to purchaser, when.

Where a tract of land, through which a railroad right of way runs, has been sold in a judicial proceeding foreclosing a mortgage, in which proceedings no reference is made to the right of way, and no reservation of the fee therein is made, the fee passes to the purchaser. (*Post, pp.* 659-661.)

5. **SAME.** Fee in abandoned or lost easement reverts to owner.

When an easement in a railroad right of way is abandoned or otherwise lost, the fee reverts to the owner of the land at the time of abandonment, instead of the original owner or owner at the time the easement was acquired, unless the fee therein was reserved for the original owner. (*Post, pp.* 660-661.)

6. **SAME.** Partition, agreement and settlement precludes the parties.

The partition and agreement entered into between the heirs of the deceased mortgageor and the purchaser of the mortgaged property under a foreclosure sale, as a final and complete division of the lands and in settlement of all accounts relating to the same, and of a previous agreement between the mortgageor and purchaser, precludes the said heirs from claiming any interest under such agreement in the lands retained by the purchaser. (*Post, pp.* 661-663.)

7. **EJECTMENT.** Complainant must establish title in himself.

The complainant in ejectment suit to recover land must establish title in himself before he can recover, regardless of what the defenses of the defendant may be. (*Post, p.* 663.)

McLemore v. Railroad.

8. **SAME.** Defendant estopped to establish certain facts, but not to rely upon facts brought out by complainant.

In ejectment suit to recover land, the defendant may be estopped from establishing certain facts; but the complainant can not use this to assert that the facts do not exist, when the record shows that they do exist, and which are necessarily brought out by the complainant in his efforts to establish his title. (*Post, pp.* 663-664.)

9. **ESTOPPEL.** Not to establish facts, but to prevent reliance upon them.

Estoppel can never be invoked to establish facts, but may only be used to prevent parties from relying upon facts which do exist. (*Post, pp.* 663-664.)

10. **SAME.** In pais is operative only when the party to be estopped is prejudiced.

Unless the complainants were prejudiced by the conduct of some of the defendants, they can not set up estoppel to prevent the real facts from being shown in the suit. There is no element of estoppel *in pais*, where the complainants were not misled or placed in any different situation on account of the facts. (*Post, pp.* 665-667.)

11. **SAME.** Judicial estoppel may be invoked by any one.

Judicial estoppel is firmly established in this State, and may be invoked by any one, regardless of whether any rights have been prejudiced by the conduct of some one else which, it is claimed, constitutes the estoppel. The policy of the law will not permit any one to gainsay what he has deliberately sworn to in the course of a judicial proceeding. (*Post, pp.* 665-666.)

Case cited and approved: Hamilton v. Zimmerman, 5 Sneed, 48.

12. **SAME.** Unsworn answer does not operate as, when.

Where an unsworn answer signed by counsel only denies a certain title, which can be nothing more than the expression of an opinion made inconsiderately and without due knowledge of the

111 Tenn—41

facts, is not operative to estop the party from asserting such title in a subsequent suit against a party not prejudiced by the former denial. (*Post, pp.* 664-667.)

---

FROM SHELBY.

---

Appeal from the Chancery Court of Shelby County.— F. H. HEISKELL, Chancellor.

RANDOLPH & RANDOLPH, and CARROLL, McKELLAR & BULLINGTON, for McLemore.

C. H. POSTON, F. P. POSTON, and WRIGHT & WRIGHT, for Railroad.

---

MR. JUSTICE BEARD delivered the opinion of the Court.

This suit was instituted by the heirs of John C. Mc-Lemore to recover possession of a strip of ground, running east and west through the city of Memphis from a point near the Mississippi river, 2⅜ miles long and 100 feet wide, to the line of the Memphis & Charleston Railroad, and known in this record as "Broadway." The prayer of the bill is for possession, for rents and profits, and general relief, including prayer for preliminary injunction preventing the various defendants from further occupying the ground for right of way purposes, and from interfering with complainant's possession.

McLemore v. Railroad.

In 1834, John C. McLemore was the owner of large tracts of land in Shelby county, Tenn., one of which extended from the Mississippi river eastwardly nearly 2½ miles to what was known as Solomon Rozelle's west boundary line, and through which this strip, 100 feet wide, known as Broadway, extends. On July 15, 1834, McLemore conveyed the property, embracing within its boundaries Broadway as well as certain other lands, by mortgage, to William and Stokely Donelson, to secure certain enumerated debts, and among other things provided: "That the said John C. McLemore reserves personally to himself the power, and it is hereby reserved to him accordingly, in as full a manner as if this mortgage were not executed, at any time before the foreclosure of his equity of redemption and sale of said mortgaged premises under decree of court, to sell or contract to sell all or any of the lands or lots aforesaid, on such terms as he may deem expedient, for the purpose of paying and satisfying the debts and claims aforesaid, or such of them, and giving such preference, as he may think right and proper, and upon such sale to be made by him as aforesaid, and the receipt of the purchase money by the said John C., to make and execute conveyances accordingly, discharged of this trust."

On June 13, 1840, William and Stokely Donelson reconveyed and quitclaimed to John C. McLemore 208 acres of the land embraced in the mortgage, and upon which was afterwards situated the town of Ft. Pickering, and which also included the western end of Broad-

way.   On June 17, 1840, McLemore conveyed this 208-acre tract, released by the Donelsons, as above stated, to the La Grange & Memphis Railroad Company, for the consideration of $25,000, but subject to certain conditions, reservations, and restrictions, among which may be noted the following:   The railroad company agreed to construct and build, within a reasonable time, a lateral railroad connecting with the La Grange & Memphis Railroad at or near the western boundary of Solomon Rozelle's land, at a point where the railroad diverged toward Memphis; and running thence west over the lands of McLemore to a point, within the 208-acre tract, at or near the south boundary and near the river, to be selected by the company.

And the deed then recites: "And for this purpose the said McLemore grants to the said company the right of way through any of his lands over which the said lateral road may pass." This recitation relates solely to the remaining portion of Broadway east of the 208-acre tract.   The deed also provided that the 208-acre tract was to be plotted into town lots by the railroad company.   In laying off the town, convenient depot grounds were to be reserved for the railroad.   Certain spaces were to be set apart and dedicated as public promenades, a male and female academy, a tavern, and for certain church purposes.   An auction sale of lots was to be held at such time as should be convenient, and, after the auction sale of lots, the railroad company was to sell from time to time lots in the town site

at private sale. The proceeds of the sale of lots were to be equally divided between McLemore and the railroad company, and at the end of five years the lots remaining unsold were to be equally divided between them.

This 208-acre tract was bounded on the west by the Mississippi river and on the east by Bayou Gayoso; and, in accordance with the terms of this deed, the tract was plotted as a town site by the railroad company, the streets ranging in width from 65 to 80 feet, with the exception of the one known as "Broadway." Toward the center of the tract, one entire block, 400 by 300 feet, was set apart, and designated on the map as the depot. West from this block to the river was a street 100 feet wide, and designated "Broadway," and the same street was continued east of this block to Bayou Gayoso, 100 feet wide, and upon this end of the street, and on its center line, was designated a railroad track. Between this depot block and Bayou Gayoso on the east, lots were made to front on either side of the street or railroad line, many of them not having any other method of egress. The purpose of McLemore and the railroad company was to make Ft. Pickering a rival town to Memphis, which was then distant about one mile north. Many of the lots were sold, considerable excitement was manifested, and some business houses were erected. Some grading was done upon the branch line of railroad extending from near the center of this 208-acre tract to the La Grange & Memphis Railroad, near Solomon

Rozelle's west boundary line. The right of way east of Bayou Gayoso was a continuation of Broadway eastwardly through the lands of McLemore embraced in the mortgage to the Donelsons. The railroad company, however, became involved financially, judgments being rendered against it as early as 1842, and executions were soon thereafter levied upon its property. No work other than some grading was ever attempted by this company upon the right of way; and, certainly as early as 1851, it became apparent that this company could never construct this branch line of road, since in January of that year it undertook to sell and convey all of its property of every kind to the Memphis & Charleston Railroad Company, and no effort to construct any line of railroad was thereafter undertaken by it.

Among other things conveyed in that deed was "the whole bed of all the road belonging to said party of the first part (La Grange & Memphis Railroad Company), together with its right of way on said road, and all the rights, privileges, immunities, and appurtenances thereunto belonging, or in any wise appertaining," and "including all its real estate at Ft. Pickering." Within a very limited period after the effort was made to establish Ft. Pickering as a commercial town, it became apparent that the scheme would be a failure. Without success to the town, the lateral railroad would not be needed; and this is no doubt the explanation of its abandonment.

It is probable that the failure of the town of Ft. Pick-

ering to prosper as contemplated caused a change in the plans of McLemore and the further indulgence of his creditors, who commenced proceedings to foreclose their mortgages, as hereinafter stated. Early in 1842, McLemore executed a second mortgage upon the same property mortgaged to the Donelsons, excluding the 208-tract above mentioned, to Willoughby Williams and Oliver B. Hayes, to secure certain debts therein set out; and in September, 1842, McLemore executed a third mortgage upon the same property, to Samuel I. Hayes, to secure certain debts therein set out; and thereafter, on October 7, 1842, William and Stokely Donelson and the other mortgagees, under the mortgages above referred to, filed their bill in the chancery court held at Franklin, Tenn., against John C. McLemore, seeking a foreclosure of all three of the mortgages, and requiring McLemore to state in his answer what part of the lands had been sold by him under the reservation contained in the first mortgage to the Donelsons. On the same day, John C. McLemore filed his answer, and among other lands mentioned as having been sold by him was the following: "The item about 600 acres, part of grant No. 19,060, embraces the sale of lots from twenty acres down to small sums, and also includes the 208 acres sold to the railroad company, a more particular description of which, as well as the land undisposed of, will be given hereafter if required. He cannot at this time give a full and accurate description thereof, but will furnish

the same to the court or its commissioners when deemed necessary."

Thereupon the cause was heard at the October term, 1842, and the lands mentioned in the pleadings were directed to be sold, and F. P. Stanton, Charles D. Mc-Lean, Marcus B. Winchester, and Jeptha Fowlkes were appointed commissioners to sell the lands through which the eastern end of Broadway runs, as well as certain other lands not necessary to be mentioned. The commissioners made a report to the succeeding term of the court, in which they stated that they had divided the lands through which the eastern end of Broadway runs into four tracts, excluding roads, streets, and sales previously made by McLemore; and that Willoughby Williams had become the purchaser of all four of the tracts, the first containing 441 acres, the second 205 acres, the third 346 acres, and the fourth 232½ acres. This report was accompanied by a plat, and made a part of the record, showing the exact boundaries of the four different tracts sold. This plat, however, has been lost, and has never been supplied.

The report of the commissioners was approved, and they were directed to execute to Willoughby Williams a deed for the property purchased by him at said sale; and accordingly, on May 17, 1843, the four commissioners conveyed to Willoughby Williams the four tracts mentioned in their report, but described the land as one entire tract, and, among other things, designated the land conveyed as being "the unsold portion of the Ft.

Pickering tract of land, which was laid off and conveyed to said John C. McLemore on the division of grant No. 19,060, subject to streets, roads, and sales previously laid out and made by said McLemore, which sales are embraced in the bounds of the said Ft. Pickering tract as hereinafter described, to-wit." Then follows a particular description of the land, which includes the entire tract owned by McLemore and conveyed by mortgage to the Donelsons, with the exception of the 208 acres theretofore conveyed by John C. McLemore to the railroad company. And within the boundaries of this deed lies the entire strip of land in controversy, east of Bayou Gayoso.

At some time subsequent to this conveyance from the commissioners to Williams, he seems to have plotted a certain part of the land east of Bayou Gayoso, embracing a part of Broadway also lying east of Bayou Gayoso, and sold lots fronting upon Broadway, treating it as roadway in his subdivision.

In 1868, the town of Ft. Pickering became a part of the city of Memphis; and subsequently certain other parts of Broadway, east of Bayou Gayoso, became a part of the city of Memphis. The city did some work upon Broadway, west of Bayou Gayoso at different times, beginning in 1868. For the most part, however, throughout its entire length, it remained vacant and unimproved land, with some grading done for a railroad, until 1871, when General Forrest, as president of the Selma, Marion & Memphis Railroad Company, en-

tered upon the strip of land, and did considerable work, preparing it for a railroad track. This road, however, became financially embarrassed, and in 1881 the Memphis, Selma & Brunswick Railroad Company entered upon the strip of ground, and did work preparatory to laying a track; and in 1882, for the first time, a railroad track was completed, along the entire length of the strip of ground, by the Kansas City, Ft. Scott & Memphis Railroad Company, as the successors of the Memphis, Selma & Brunswick Railroad Company. From that time until this bill was filed, in December, 1889, other tracks were placed upon Broadway, and there was litigation between these various railroad companies and the city of Memphis, each claiming title to all or parts of this strip of ground. The heirs of John C. McLemore appear never to have asserted any title or ownership to any part of this strip of ground until about the time the bill in this suit was filed. The Memphis & Charleston Railroad Company claimed to have become the owner in fee of the entire strip under its deed from the La Grange & Memphis Railroad Company, made in 1851, and the deed of the state of Tennessee conveying its interest in the property to the Memphis & Charleston Railroad Company, executed in 1852. Willoughby Williams conveyed, in January, 1867, a one-fourth interest in this entire strip to Archibald Wright and Lewis B. McKissek, and upon the same day entered into a lease with Esau Jones, by which he leased the prop-

erty in question to Jones for a period of seven years from January 1, 1867.

Willoughby Williams, by will probated in December, 1882, devised his "Memphis & Ft. Pickering property, and any other property I [he] may have omitted to mention herein," to his executors, to be sold, and the proceeds to be equally divided among his children. Willoughby Williams' executors, on November 13, 1886, conveyed the property in dispute to Wallace Pratt; and Wallace Pratt conveyed on November 14, 1887, to the Kansas City, Springfield & Memphis Railroad Company. On December 28, 1867, Willoughby Williams entered into an agreement with the heirs of John C. McLemore, in which Williams conveyed to McLemore's heirs certain specified property included within the boundaries of the original tract of land purchased by him at the chancery sale, but south of and entirely apart from this 100-foot strip, which was accepted by the McLemore heirs as a final division of the land mentioned in an agreement made in 1859 between Williams and McLemore, and therein referred to, but which agreement has not been found, and its contents have not been otherwise ascertained.

John C. McLemore died in 1864. The present parties complainant are his grandchildren and great-grandchildren, many of whom have resided since the death of John C. McLemore near the city of Memphis and in Shelby county. McLemore himself resided in Memphis until 1850, when he removed to California, and re-

turned to Memphis in 1859, and remained until his death in 1864. The property in dispute is now claimed in part by the city of Memphis, which insists that that part of Broadway west of Bayou Gayoso has been a public street since the original dedication in 1840. That part of the strip lying east of Bayou Gayoso is claimed in part by the city of Memphis as a street, and in part by certain railroad companies which have from time to time, since 1881, placed thereon railroad tracks, under agreement between themselves and the authorities of the city of Memphis. It is conceded that the strip of ground is now exceedingly valuable, and that improvements costing hundreds of thousands of dollars were placed thereon prior to the institution of the present suit, and without any intimation of any claim upon the part of the heirs of John C. McLemore.

We do not think that the title to the entire strip of ground in controversy can be rested upon the assumption that it all must necessarily be in the heirs of John C. McLemore or that the title to the entire strip was devested out of McLemore under the same proceedings or conveyances. Upon the contrary, we think that the title to that part of Broadway west of Bayou Gayoso, and lying within the boundaries of the 208-acre tract conveyed by McLemore to the railroad company, rests upon entirely different proceedings and conveyances from that part of Broadway lying east of Bayou Gayoso. The title to the former must be traced from the deed of John C. McLemore to the railroad company made in

1840; and the title to the latter must be traced from the proceedings in the chancery court at Franklin, 'n which the mortgages were foreclosed upon the tracts of land within which the eastern part of Broadway lies. The deed from McLemore to the railroad company in 1840 expressed a cash consideration of $25,000, but was made "subject to certain conditions, reservations, and restrictions." This cash consideration was evidently paid, which is evidenced not alone by the recitation in the deed, but it is referred to both in the correspondence of McLemore and of the president of the railroad company.

It is true that the railroad company agreed to build a lateral line of road, from the main line to about the center of this 208-acre tract, within a reasonable time after the execution of the deed. It is not necessary, however, to determine what would be the respective rights of the parties to this conveyance upon the failure of the railroad to build the lateral line within a reasonable time. However this may be, the railroad was not built within a reasonable time, or any other time, by the La Grange & Memphis Railroad Company, but the ground was laid out as a town site, as provided in the deed, lots were sold, and the proceeds presumably divided in accordance with terms of the deed; certain parts of the tract were designated upon the map as streets, and a block expressly reserved for a depot site, as provided for in the deed. We think it clearly appears that the 100-foot strip from this depot site to

the eastern boundary of the 208-acre tract was intended as a street and railroad right of way combined. Lots were fronted upon either side with no other outlet than this street. The continuation westwardly from the depot site to the river is plainly marked as a street, and it is of the same width.

When Ft. Pickering was taken into the corporate limits of Memphis, the city, as early as 1868, exercised municipal control over this land as a street, without any objection upon the part of any one. When it became apparent to every one that the railroad would not be built, and could not possibly be built, by the La Grange & Memphis Railroad Company, no steps were taken to recover possession, and no claim of ownership was asserted by McLemore or anyone claiming under him. But, whatever right John C. McLemore may have had to regain possession of this part of the land in controversy after the failure of the railroad company to construct this lateral line within a reasonable time, he divested himself of all ownership, and of all rights in the premises, as early as 1859; since on the 15th of August of that year he entered into a deed of partition with certain parties claiming to be the successor in interest of the La Grange & Memphis Railroad Company in the 208-acre tract, and with whom John C. McLemore dealt as such successors.

In this deed of partition, it is recited that there had at some time in the past been a division of the unsold part of the 208-acre tract between McLemore and the rail-

road company, which McLemore was then willing to and desired to ratify, and thereupon certain specified lots were conveyed by Wickersham, Scruggs, and others who claim to be the successors of the railroad company to Charles D. McLean, with the consent of McLemore, as his (McLemore's) share of the unsold portion of the 208-acre tract; and he, in turn, conveyed by quitclaim to these parties "all the rights, title and interest or estate, into or concerning all the residue of the lots and lands in said town of Ft. Pickering, which he now has, or had on the 5th day of October, 1843, or thence hitherto."

It is evident that this deed was intended as a final settlement of all the interest of McLemore remaining in the 208-acre tract under his deed to the railroad company in 1840; and it is equally clear that he fully realized at this time that the railroad would not be built as contemplated in said deed of 1840, since he obtained title, in his portion of the unsold property under this partition deed, to the land or block which had been reserved under the terms of the original deed for depot purposes. We cannot believe that he would have appropriated to his own use the grounds set apart for a depot if he at that time contemplated the completion of the railroad as originally intended.

But if there is doubt as to the effect of this deed of partition upon whatever interest Col. McLemore may have had in so much of Broadway as lay west of Bayou Gayoso, and within the limits of the 208-acre tract, it

is set at rest by a conveyance which he made to C. D. McLean about two months thereafter, to wit, on the 31st of October, 1859. By this, for a consideration, valuable in part, he conveyed to McLean in fee "all the rights, titles, interest, and claims" he had "in and to all lots, lands, depots, grounds, academy lots as set apart for the use of schools, together with all lots reserved for the use of churches, all rights of ferry, etc., together with all other rights and reservations, belonging to said McLemore, situate within the original limits of the town of Ft. Pickering as sold and conveyed by him by deed dated 17th day of June, 1840, containing 208 acres more or less." We therefore hold that by these two deeds the ancestor of complainants divested himself of all interest, direct or indirect, immediate or remote, in every portion of this particular tract, and that, independent of other considerations which of themselves would be sufficient to repel the complainants, the bill must fail in so far as it seeks to establish rights therein, and that the chancellor was right in so decreeing.

In the consideration of the ownership of the title to the remaining portion of Broadway, we are confronted at the threshold with a question as to what was the character of the interest acquired by the La Grange & Memphis Railroad Company to that part of the right of way east of Bayou Gayoso, under the conveyance by John C. McLemore made in 1840. We observe, in passing, that the reservation to McLemore in the mortgage to the Donelsons only gave him the power to sell, or con-

McLemore v. Railroad.

tract to sell, parts of the mortgaged premises, for the purpose of discharging the debts secured thereunder. When he executed his deed to the railroad company, in 1840, for the 208-acre tract, the title to which was in him by quitclaim deed from the Donelsons, he under-took to convey to the railroad company the right of way over any other lands owned by him which might be need-ful in the construction of the railroad line from the main line of road to the 208-acre tract. Clearly, the purpose of this conveyance of a right of way over the remaining portions of the land owned by McLemore, but under mortgage to the Donelsons, was not so much the paying of the mortgage as it was to develop and make valuable the 208-acre tract when it should have been laid out as a town site and the railroad constructed to it.

We cannot construe the language of the deed ·to con-vey anything more than an easement over the mortgaged lands to the railroad company, which was subject to be defeated by abandonment or voluntary surrender to the owner. The clause in the deed making the grant has been set out in an early part of this opinion. It was very general, and in terms only purported to convey an easement. "A grant of a right of way to a railroad company is the grant of an easement merely, and the fee remains in the grantor. Jones, Easem., sec. 211; citing *Railway Co.* v. *Geisel*, 119 Ind., 77, 21 N. E., 470; *Jones* v. *Van Bochove*, 103 Mich., 98, 61 N. W., 342; *Railroad Co.* v. *Frost*, 147 Mass., 121, 16 N. E., 773; *Fla-*

111 Tenn—42

*ten* v. *City of Moorhead,* 51 Minn., 518, 53 N. W., 807, 19 L. R. A., 195; *Williams* v. *Railway Co.,* 50 Wis., 71, 5 N. W., 482; *Robinson* v. *Railroad Co.,* 59 Vt., 426, 10 Atl., 522. The nature of an easement, for railroad right of way purposes, is so clearly stated in *Railway Co.* v. *Telford's Ex'rs,* 89 Tenn., 293, 14 S. W., 776, that we cannot hope to add anything to what has there been said.

In considering the foreclosure proceedings in the chancery court at Franklin, in which the land through which this right of way extended was sold, we do not think that we are warranted in looking outside of the proceedings and the deed of the commissioners, executed in obedience to the decree of the court in that case, to indulge presumptions favorable to the contentions of parties, after the lapse of nearly half a century, when to do so would be contrary to the recitals found in the deed, and which seemed to have been accepted and acted upon by the purchaser under the deed and certainly not contradicted or denied by the former owner.

It is true Mr. Stanton, one of the commissioners making the sale, in a deposition of remarkable intelligence and fairness, but given nearly sixty years after the transaction, says the commissioners did not sell this strip of ground; but this statement is not borne out by the natural inference from the deed and report made by them. We think that the only safe course is to construe the proceedings and the deed made in the pursuance thereof according to the legal import contained in

---

---

the language of the chancery proceedings and the deed of the commissioners.

The foreclosure proceeding was instituted in 1842; and, under the decree of the court, commissioners were appointed to sell all of the remainder of the property embraced in the mortgage of the Donelsons, and remaining unsold. McLemore was required in his answer to state what portions of the land he had sold, and, while specifying considerable property which he had disposed of, he made no mention in his answer of having sold or conveyed any strip of land to the railroad company for right of way purposes. The decree of the court, the report of the commissioners, and the pleadings made no reference to any such sale or right of way. The commissioners sold the land through which the right of way ran, after having subdivided it into four tracts. No mention was made of any reservation except sales previously made and the streets and roads. Willoughby Williams having been the successful bidder for each of the four tracts, the commissioners executed to him a deed, describing the property as one tract, instead of describing separately each of the four lots into which the tract had been divided. This deed was made "subject to streets, roads, and sales previously laid out and made by said McLemore." But clearly this reservation is not sufficient to exclude the fee to any unsold part of the land, but, at most, conveyed the fee subject to the right of way or easement in favor of the railroad company.

And we do not think that, when this easement was abandoned or otherwise lost, the fee reverted to the former owner, instead of to the purchaser under the chancery sale, claiming through the deed of the commissioners executed to him. It appears, as has been stated, that there was a map, accompanying the report of the commissioners, showing definitely the boundaries of each of the four lots into which the tract had been divided previous to the sale; but this map has been lost, and all efforts to supply it have failed; and, in the absence of this map, we do not think that the proceedings or the deed warrant the presumption that the strip of ground embracing the right of way was excepted from the sale, regardless of what the intention of the commissioners may have been at the time the sale was made. To hold that the fee to this strip of ground was excluded from the sale, and from the deed executed by the commissioners in obedience to the orders of the court, would be to contradict the language of the deed and of the decree, as well as the legal import thereof.

The effort has been made, in argument, to demonstrate that the fee to this right of way must have been excluded in the sale, by calculations intended to prove that to include the ground embracing the right of way would result in embracing a larger acreage than was sold; but we think that this result is obtained by too many suppositions and hypotheses to overturn the plain language of the deed, and the legal results flowing from the proper interpretation of its terms. As we have said,

it is clear that the railroad company only acquired an easement over the lands east of Bayou Gayoso under the deed of 1840; and it is equally clear that under the terms of the decree of sale and the commissioners deed thereunder to Willougby Williams, in 1843, he acquired all the rights in the fee which were then possessed by McLemore, subject, possibly, to this easement of the railroad company. Therefore, if the easement was lost or abandoned by the railroad company, there was nothing to revert to McLemore; but the title of Williams became free from the easement theretofore existing.

It is next insisted that this purchase by Williams under the chancery proceedings was really for the benefit of McLemore, and that therefore he held the title in trust for McLemore, and not for himself. There are circumstances developed in the record which do indicate that there was some kind of an arrangement or understanding, between Williams and McLemore, by which Williams recognized the fact that McLemore had some interest in some part of the lands conveyed to him by the commissioners; but whether this arrangement was made prior to the sale at which Williams became the purchaser, or whether it was later, is not in any way indicated in the record; nor does it appear whether McLemore secured any interest in this particular tract through which this right of way ran at the time of the chancery sale or any other time. But certainly there is not sufficient evidence in the record to justify us in holding that Williams purchased this property under

foreclosure proceedings for the use and benefit of Mc-
Lemore.  And, for another reason, the heirs of John C.
McLemore could not have had any interest in this prop-
erty, after 1867, under any agreement with Williams,
since we find in the record that in that year a settle-
ment was made between Williams and McLemore's
heirs, and this settlement refers to a prior agreement
between Williams and McLemore, the contents of which
however, are not known; and in this agreement, made in
1867, certain specified lands are conveyed by Williams
to the heirs of John C. McLemore, and it concludes with
the following: "This agreement is entered into and
accepted by the said heirs of John C. McLemore, de-
ceased, and the said Williams, as a final division of the
land mentioned in the agreement of said Williams and
McLemore, which is hereby referred to."

The lands conveyed in this agreement to the McLe-
more heirs are situated wholly outside of the lands
through which Broadway extends, and the agreement
was executed in the latter part of the same year in
which Williams had claimed title to all of Broadway,
and had conveyed a one-fourth interest to Wright and
McKissek, and entered into a lease with one Jones for
a period of seven years from January 1, 1867.  What
the agreement between Williams and McLemore was,
this record wholly fails to show; but, whatever it was,
it was finally ended by the settlement made in 1867,
above referred to.

It is true that this agreement was not signed by the

McLemore heirs, but by C. D. McLean for them; and we refer to it because he probably had a more intimate knowledge of the affairs of John C. McLemore than did the heirs; he having been the confidential friend and adviser of John C. McLemore through a long period of time, beginning as early as 1840, and from 1850 to 1859 was the representative of McLemore in all his business matters in Memphis.   But upon the same day the heirs of McLemore did execute an agreement, in substance the same, which referred to the prior agreement between McLemore and Williams as being dated February 4, 1859; and this agreement, signed by the McLemore heirs contains the following recitation:   "This partition and agreement is a final and complete division of the lands and settlement of all accounts relating to the same, and to the said agreement between the said Williams and John C. McLemore, Sr., of date February 4th, A. D., 1859."

It is insisted that the defendants are estopped to rely upon the title derived from Williams, because in a former litigation, to which the heirs of McLemore were not parties, certain of the defendants in this cause denied the Williams title in their unsworn answers. We might omit any discussion upon this point by calling attention to the fact that the complainants in this case must establish title in themselves before they can recover, regardless of what the defenses of the defendants may be. Estoppel can never be invoked to establish facts, but may only be used to prevent parties from relying upon

facts which do exist. In this character of litigation,
the defendants may be estopped from establishing cer-
tain facts; but the complainants cannot use this to as-
sert that those facts do not exist when the record shows
that they do exist, and which are necessarily brought
out by the complainants in their efforts to establish
their title.

We do not, however, deem it necessary to rest our de-
cision alone upon this view of the question. We do not
think that the facts disclosed by the record create an
estoppel against any of the parties to this record. It
appears that in June, 1886, the executors of Williams
instituted suit against the Kansas City Company, the
Memphis & Charleston Railroad, and the heirs of Mc-
Kissek and Wright, setting up title to Broadway, and
deraigning title from McLemore under the mortgages,
chancery sale, and deed of the commissioners to Wil-
liams. The Memphis & Charleston Railroad Company
filed an unsworn answer, only signed by its counsel, in
which Williams' title was denied, and its title under the
deed from the La Grange & Memphis Railroad Company
made in 1851, sought to be established. The Kansas
City, Springfield & Memphis Railroad Company also
filed an answer, which has been lost, and never supplied.
The heirs of Archibald Wright filed an answer and
cross bill, in which they set up title to an undivided
one-fourth interest in Broadway under the deed of Mc-
Kissek and Wright, made in 1867.

Thereupon the Kansas City, Springfield & Memphis

McLemore v. Railroad.

Railroad Company and the Memphis & Charleston Railroad Company filed separate answers to this cross bill, which were also merely signed by counsel, and unsworn to. And it is the allegations contained in these answers which, it is claimed, estop them in the present case. The answer of the Kansas City Company is rested largely upon a denial of the Wright and McKissek title, limitations, and laches.

The Memphis & Charleston Railroad Company, in its answer, did deny the validity of the Williams title, and did recite many of the contentions now made by the complainants in this case. We think, however, that these pleadings were conclusions of law concerning the title, rather than a statement of facts deliberately made with due knowledge. There is, however, no element of estoppel *in pais,* for the reason that the complainants not only were not misled or placed in any different situation on account of these facts, but seem to have derived benefit therefrom, by seeking to set up many of the same facts in the present suit, for the purpose of insisting upon title in themselves. Unless they were prejudiced by the conduct of some of the defendants, they cannot set up estoppel to prevent the real facts being shown in the present case. It is only by invoking the doctrine of judicial estoppel that the question is entitled to serious consideration.

The law of judicial estoppel is firmly established in this State, and may be invoked by any one, regardless of whether any rights have been prejudiced by the con-

duct of some one else which, it is claimed, constitutes the estoppel. The policy of the law will not permit any one to gainsay what he has deliberately sworn to in the course of a judicial proceeding.

The doctrine is thus stated in the leading case of *Hamilton* v. *Zimmerman*, 5 Sneed, 48.

"This doctrine is said to have its foundation in the obligation under which every man is placed to speak and act according to the truth of the case, and in the policy of the law to suppress the mischiefs from the destruction of all confidence in the intercourse and dealings of men, if they were allowed to deny that which by their solemn and deliberate acts they have declared to be true. And this doctrine applies with peculiar force to admissions or statements made under the sanction of an oath, in the course of judicial proceedings. The chief security and safeguard for the purity and efficiency of the administration of justice is to be found in the proper reverence for the sanctity of an oath."

But, in the same case, we find the following exceptions to the general rule, thus stated: "Admissions or declarations made *in pais* are often entitled to little or no consideration, because made inconsiderately, or in ignorance of the facts, or not correctly understood or reported. And even when made with more deliberation and under oath, it may be made to appear that they were made inconsiderately or by mistake; and, if this be so, the party ought certainly to be relieved from the consequences of his error." We do not think that the

unsworn pleadings in this record come within the rule of law, which is intended to suppress fraud and to prohibit the deliberate shifting of position to suit the exigencies of each particular case that may arise concerning the subject-matter in controversy. In this case, it is claimed that the statements made in the former pleadings were not made considerately, and with a due knowledge of facts, and that a further examination of the subject-matter has led to a wholly different conclusion. We are satisfied that any statement, concerning the title to Broadway, which may have been made on behalf of any of the various interests in the various litigations which have arisen, from time to time, concerning this property, could not be more than the expression of an opinion, and that no statement can be said to have been made. so considerately, and with such knowledge of the facts, as to estop the parties. This property has been a fruitful source of litigation for a great number of years, and, from an examination of the immense record in this. cause, we are not prepared to apply a rule of law, intended to prevent injustice, to such a complicated state of facts as is shown to have existed concerning the title to this particular property. Having concluded that the heirs of John C. McLemore had no title to any of the land in. controversy when this suit was instituted, we do not deem it necessary to discuss or decide any of the other questions raised on the record, and therefore limit our decision to the single point that there is "no title in the complainants."

The decree of the chancellor is accordingly affirmed, with costs.