# BUICE v. SCRUGGS EQUIPMENT CO., Inc. et al.—267 S. W. (2d) 119.

Eastern Section. September 11, 1953.

Rehearing denied November 6, 1953.

Petition for Certiorari denied by Supreme Court, April 16, 1954.

558

Fowler, Long & Fowler, of Knoxville, for appellants.

Grimm, Tapp & Carson, of Knoxville, for appellee.

HOWARD, J. Referring to the parties as they appeared below, the complainant, M. M. (Jack) Buice, filed the original bill herein against the defendants, Scruggs Equipment Company, Inc., hereinafter referred to as Company or Corporation, and William A. Keen, for breach of an alleged verbal contract between complainant and the defendants. The bill alleges in substance, as follows:

That the defendant Keen and E. C. Scruggs were prior to June 1, 1951 the sole and equal owners of all the capital

stock in the defendant Corporation, which consisted of 2,000 shares, and that because of a disagreement which arose between the owners it became evident that one or the other must sell his stock; that in view of this fact, and looking to the future, both Keen and Scruggs separately approached the complainant, who was an employee of the Company, about future employment; that Scruggs told complainant that it was necessary, because of the disagreement, for him or Keen to own all the stock in order to have control of the corporation, and that if he, Scruggs, sold his stock or interest to Keen, he was going to form another concern doing a competitive business with the defendant Company, and offered complainant employment.

That the defendant Keen also made complainant the proposition that if complainant would assist him in conducting the business of the Company, after Keen acquired control, that the defendants, Keen and the Company, would give complainant a contract of employment at a stipulated salary per month, plus sales commissions, costs of the operation of his car, etc., and would also make him Vice President and a member of the Board of Directors of the Corporation, and would sell him 300 shares of the Company's stock at the par value of $100 per share, upon terms agreed upon. Then follows a description of the terms, dates of payments, etc., for the stock.

That Keen, speaking for himself and the defendant Company, asked that the complainant remain with the Company and assist him in the negotiations of the purchase of the stock from Scruggs, and assist in "retaining certain manufacturers' accounts, and assist respondents in the purchase and retention of the fabricating business known as the Fabricated Products, Inc., including the

equipment thereof, as a going concern, all of which complainant did * * *.''

That complainant accepted the defendant's offer to remain with the Company and as result of complainant's efforts Keen was able to purchase all of the stock owned by Scruggs, and that he, the complainant, completed his portion of the contract with the defendants by carrying out everything that he had agreed to, including the surrendering of an employment contract with the Company dated January 1, 1951 for the entire year.

That the complainant was made a Vice President and Director of the Corporation, but that the defendant Keen, now the sole owner of all the Corporation's stock, refused to deliver the 300 shares of stock to complainant as had been agreed upon.

That ''Since May 31, 1951, the Respondents, first upon one pretext and then another, have avoided and evaded executing and delivering to complainant said stock and a written memorandum of said contract, as they had agreed to do, until October 15, 1951, when complainant demanded that he be furnished with said stock and said executed written memorandum; whereupon, Respondents, through mala fides, abruptly and arbitrarily repudiated said agreement and contract and discharged complainant without ever having issued any of the 300 shares of stock to him, although complainant since May 31, 1951, has stood ready and willing to execute the note as referred to herein, to complainant's damages in the sum of Twenty Two Thousand Five Hundred ($22,500) Dollars, with interest thereon from the date of the filing of this bill, * * *.''

Complainant's bill prayed for a decree and recovery of the aforesaid damages with interest, and for general relief, and demanded a jury to try the issues.

561

Defendants at first filed a demurrer to the bill which was sustained by the Chancellor, and upon appeal the Supreme Court in a published opinion reversed this decree and remanded the cause for further proceedings. See Buice v. Scruggs Equipment Co., 194 Tenn. 129, 250 S. W. (2d) 44.

Answering jointly the defendants denied "that they or either of them entered into a contract of the character alleged * * *," and denied "all other averments in the original bill." They averred that "The alleged contract being in parol and the alleged acts of service of complainant not being referable to the alleged contract; and, accordingly, there having been no part performance on the part of complainant and the complainant not having given something in earnest to bind the contract, these respondents rely upon the statute of frauds, Code Section 7197, which is pled as a defense to the cause of action sought to be alleged in the original bill," and that "complainant gave no consideration to support the alleged contract."

At the outset of the trial the Court announced that the parties had agreed upon six Issues of Fact to be submitted to the jury. These Issues and the jury's answers thereto were as follows:

"(1) Did the Respondent, Scruggs Equipment Company, Inc., employ the complainant as sales manager for all refrigeration, store and market equipment as set forth in a written memorandum dated January 1, 1951? Answer: Yes. (It was stipulated by the parties that the proper answer to Issue No. 1 was 'Yes'.)

"(2) Did the complainant and respondents, Scruggs Equipment Company, Inc., and William A. Keen, enter into another agreement as alleged in

Section III of the bill of complaint in this cause? Answer: Yes.

"(3) If your answer to No. 2 is Yes, did the complainant, M. M. (Jack) Buice, render to the respondents, Scruggs Equipment Company, Inc., and William A. Keen, such services as were required of him by the said agreement after the agreement was entered into and prior to October 15, 1951? Answer: Yes.

"(4) If your answer to No. 3 is Yes, did the respondents, Scruggs Equipment Company, Inc., and William A. Keen, fail and refuse to issue to complainant, M. M. Buice, the 300 shares of the respondent Corporation's capital stock at a price of $100.00 per share as provided in said agreement? Answer: Yes.

"(5) If your answer to No. 4 is Yes, what was the fair cash market value of said 300 shares of capital stock of the respondent, Scruggs Equipment Company, Inc., on the date respondents, Scruggs Equipment Company, Inc., and William A. Keen, failed and refused to carry out the terms of said agreement? Answer: $150 per share.

"(6) If your answer to No. 4 is Yes, what is the amount of damages to which the complainant, M. M. Buice, is entitled to recover from the respondents, Scruggs Equipment Company, Inc., and William A. Keen? Answer: $15,000.00."

Upon the findings of the jury, which were approved by the Chancellor, a decree was accordingly entered for the complainant against the defendants for $15,000 and costs, and upon the overruling of the defendants' motion for a new trial, which was seasonably filed, the defendants were granted and have perfected this appeal.

First the defendants contend that there was no evidence that a verbal contract was entered into as alleged, that

the complainant had failed to prove an indivisible contract, and that complainant having failed to prove part performance, recovery was precluded under the Statute of Frauds, Code Section 7197.

■ Under our decisions the findings of a jury in Chancery cause, approved by the Chancellor, have the same force and effect as a jury verdict in a law court. They are conclusive and will not be set aside by this court if there is any material evidence to support them. Code Sec. 10579; Stafford v. Stafford, 1 Tenn. App. 477; Meyer v. Cooper, 6 Tenn. App. 38; National Life & Accident Ins. Co. v. American Trust Co., 17 Tenn App. 516, 68 S. W. (2d) 971; Standard Life Ins. Co. of the South v. Strong, 19 Tenn. App. 404, 89 S. W. (2d) 367. Therefore, these assignments must be disposed of upon the consideration of the proof tending to support the findings of the jury, without reference to that opposed thereto, and if the findings are supported by any material evidence, the decree must be upheld. After reviewing the evidence in the light of the foregoing rules, we find these assignments without merit.

The record discloses that the defendant Corporation has for several years been successfully engaged in the business of selling kitchen, restaurant and refrigeration equipment to schools, hospitals, restaurants, stores, etc., throughout East Tennessee and surrounding states. Its principal office and store are located in Knoxville, Tennessee, with a branch office in Greeneville, South Carolina, and several salesmen are regularly employed. Complainant was employed by the defendant Company in 1947, as Sales Manager in charge of the refrigeration department, and on the 1st day of each succeeding year had been given a written contract of employment for the entire year. His contract dated January 1, 1951, provided, among

other things, (1) a salary of $400 per month; (2) 2% of the net sales after deduction of sales tax, carrying charges, interest, etc.; (3) 10% of the net profits from the refrigeration, store and market department, and (4) $40 per month for the use of his car; also liability insurance on said car, together with his traveling expenses while on the Company's business outside of Knoxville. A new contract was subsequently entered into between the complainant and the defendants as will hereinafter appear.

Prior to May 31, 1951, it appears that all the capital stock of the defendant Corporation, which consisted of 2,000 shares, was equally owned by E. C. Scruggs, Sr., President, and the defendant William A. Keen, Secretary & Treasurer, and that in the spring of said year a disagreement arose between these stockholders over the issuance and sale of additional stock Scruggs wanted to issue to his son, E. C. Scruggs, Jr., and T. T. Bush, the Sales Manager. The issuance of additional stock was opposed by Keen, who did not want to lose equal control of the management of the Company. This disagreement finally resulted in an agreement that Scruggs would sell all his interest and stock in the Corporation to Keen for $175,000 cash, with the further understanding that he, Scruggs, intended to enter into a competitive business in Knoxville, which was subsequently done under the name of E. Carlton Scruggs, Inc.

While the negotiations were pending between Scruggs and Keen, it appears that both approached the complainant about hiring him, Scruggs wanting complainant to go with the new Company which he planned to organize, and Keen wanting complainant to remain with the defendant Company, in the event he acquired Scruggs' stock, and after further negotiations between complainant and Keen, the following verbal contract was entered into:

That complainant agreed (1) to remain with the defendant Company and assist Keen with the purchase of Scruggs' stock; (2) assist in the general management of the Company's business; (3) assist in retaining the manufacturers' lines; (4) assist in the purchase and retention of Fabricated Products, Inc., a subsidiary of the defendant Corporation, including the equipment thereof, and (5) the cancellation of his employment contract with said Corporation dated January 1, 1951.

That the defendants agreed (1) to pay him a salary of $400 per month for the balance of the year; (2) allow him $40 per month for depreciation on his car and pay the liability insuranec thereon; (3) pay all traveling expenses while on the Company's business; (4) pay him ½ of 1% on the gross sales of the Company, including the sales of the branch office in Greeneville, South Carolina; (5) make him a Vice President and Member of the Board of Directors of the Company, which positions he was to retain as long as he remained a stockholder therein; (6) sell him 300 shares of the capital stock of the Company at $100 per share on the following terms:

$2,500 on or before January 1, 1952;
$3,500 on or before January 1, 1953;
$4,000 on or before January 1, 1954;
$6,000 on or before January 1, 1955;
$7, 000 on or before January 1, 1956; and
$7,000 on or before January 1, 1957;

with interest accruing thereon at the rate of 5% per annum, payable annually, and evidenced by complainant's installment note to which said stock was to be attached as collateral security, with a 30-day option in defendants to repurchase said stock at book value in the event complainant elected at any time to sell, and, in the event complainant failed to pay any installment on said note when

due, or the interest thereon when due, defendants had the option to recall the 300 shares of stock and either reissue complainant sufficient shares at $100 per share to cover the principal amount theretofore paid, or, in the alternative to refund the amount of principal, without interest, theretofore paid; and (7) to execute and deliver to complainant a contract embodying this agreement.

According to the complainant the above verbal agreement was entered into during the month of April, 1951, about six weeks before the final contract was consummated on May 31, by which Keen and the Corporation acquired Scruggs' stock; that subsequent to the verbal agreement complainant accompanied Keen to the Park National Bank of Knoxville where they made an unsuccessful attempt to borrow $150,000, and when it appeared that Keen's efforts to raise the money to purchase the stock had failed, Keen, at complainant's suggestion that he convey his interest in five parcels of real estate owned as tenants in common with Scruggs, authorized the complainant to go to Scruggs and see what could be done, and immediately left with his family for a trip to Washington, D. C. After Keen left, it appears that the complainant went to Scruggs and not only persuaded him to accept Keen's real estate at an agreed valuation of $85,750 for 490 shares of his stock, but that Scruggs was also persuaded to include in the transaction all his interest and stock in Fabricated Products, Inc., which amounted to $5,000, as well as the branch office at Greeneville, S. C.; that upon Keen's return he and the Corporation were able to complete the deal with Scruggs by purchasing the remaining 510 shares of stock, the Corporation borrowing $60,000 from the Park National Bank, Keen raising $20,000 personally, and by taking $9,250 from the Corporation's bank account, making the total of $175,000, or

$175 per share, which the defendants paid Scruggs for his 1,000 shares of stock.

The record further discloses that the complainant assisted the defendants in retaining and holding the accounts of several manufacturers whose products the Company handled, and that he wrote numerous letters and made several trips to different cities in order to retain these accounts; that he not only contracted and hired a Sales Manager to take the place of T. T. Bush, who had previously resigned in March, 1951, but that he also hired other employees and assisted Keen in the re-organization of the Company; that three months after Keen acquired control, the Corporation became the owner of the American Cabinet Company, of Knoxville, Tennessee, because of its indebtedness to the Corporation, and that complainant consolidated this Company with the Fabricated Products, Inc., which was moved into the building formerly occupied by the Cabinet Company, thereby greatly reducing the monthly rental; that complainant also assisted Keen in purchasing a restaurant business for and on behalf of the Company, and also settled various lawsuits for the Company, including one at Bluefield, Virginia, for $11,000.

The proof further shows that the defendants carried out portions of the agreement with the complainant by making him a Vice President and Director of the Corporation, paying him the salary, commissions, etc., but refused after repeated requests to sell him the 300 shares of capital stock under the terms specified by the contract though, according to the complainant, he stood ready and willing to execute the installment note called for by the agreement, and that the defendants had also refused and failed to deliver to him a written contract embodying the agreement. It was admitted, however, that the defend-

ants were willing to sell complainant 300 shares of "watered-down" stock at $100 per share, which offer he refused, and subsequently thereto, on October 15, 1951, he was discharged by Keen. It seems that the complainant's services were entirely satisfactory until about two weeks before his discharge when the dispute arose over Keen's refusal to carry out the terms of the original agreement.

There was a sharp conflict in the evidence as to whether or not "a complete contract" was made in April, 1951, as testified by complainant, or as testified by Keen "It was sometime in June, probably the latter part of June," and "I didn't give him the amount at that time." These issues were settled by the findings of the jury, and as will be observed by the complainant's evidence which we have reviewed at considerable length, there was ample evidence to support the jury's findings (1) that the defendants made a verbal contract to sell complainant 300 shares of stock in April, 1951; (2) that the contract was complete; (3) that the complainant had performed his obligations thereunder, and (4) that the defendants had breached the contract by refusing to deliver the stock.

Regarding the Statute of Frauds, Code Section 7197, relied upon by the defendants under these assignments, it now seems to be an established rule in this State that in transactions involving personal property where one party to an oral contract has, in reliance thereon, so far performed his part of the agreement that it would be perpetrating a fraud on him to allow the other party to repudiate the contract and to set up the Statute of Frauds in justification thereof, equity will regard the case as being removed from the operation of the Statute and will grant the injured party appropriate relief for its breach. Buice v. Scruggs Equipment Co., supra; Ashley

& Gibbs v. Preston, 162 Tenn. 540, 39 S. W. (2d) 279; 37 C. J. S., Evidence, Sec. 249, pp. 755, 756.

Next the defendants contend that there was no evidence to support the jury's finding that the book value of the stock was $150.00 per share. With this contention we are unable to agree, because of the following testimony of the complainant:

"Q. At the time you entered into this agreement, this new agreement in April of 1951, with Mr. Keen and Scruggs Equipment Company, were you told what the value of that stock was by Mr. Keen or anyone else? A. Well, we discussed it several times previous to that about the worth of the stock. It was worth over $200.00 a share at that time, and when Mr. Scruggs sold out his interest, why the stock was worth $175.00 or upper of that.

"Q. You mean that was the fair cash market value? A. Yes, sir.

\* \* \* \* \* \*

"Q. What was the fair cash market value of that stock as of the time you entered into this agreement with Scruggs Equipment Company and Keen in April of 1951? A. $175.00."

On cross-examination defendant Keen testified as to the value of the stock, as follows:

"Q. You know it was worth more than $175.00 a share? A. I thought it was.

"Q. You thought you were getting a good deal when he offered to sell you his stock for $175.00 a share? A. I didn't think I was getting cheated.

"Q. You thought it was worth more than $175.00 a share? A. At that time, yes.

\* \* \* \* \* \*

"Q. In order to ascertain the book value of stock of a corporation, you divide the number of capital shares of stock outstanding into the net worth of the corporation to get the book value per share, do you not? A. That's right.

"Q. Take Exhibit 3, which you have brought to Court at our request, and tell us what Exhibit 3 shows the net worth of the corporation to be as of June 30, 1951? A. $325,443.69.

"Q. At that time there were only 1490 shares of capital stock outstanding, all in your name, were there not? A. Yes, that's right.

"Q. Will you divide 1490 shares of outstanding stock in your name into the figure $325,443.69 and give the Court and Jury the book value per share as of June 30, 1951?

\*　\*　\*　\*　\*　\*

"A. $218.15.

\*　\*　\*　\*　\*　\*

"Q. Refer to Exhibit 4 filed in this cause and particularly to page 1 of this auditor's report, which shows the balance sheet of Scruggs Equipment as of December 31, 1951, and tell the Court and Jury what that auditor's report shows the total net worth of the company to be? A. $326,828.64.

"Q. At that time there were still only 1490 shares outstanding, all in your name, or in your family's name, December 31, 1951? A. That's right.

"Q. Can you tell us what the book value of those 1490 shares of stock were? How much did you figure it? A. $219.34.

"Q. Then as of December 31, 1951, this stock had a book value of $219.34 per share? A. Yes, sir."

■ The amount of damages is primarily a jury question and the law does not require exactness of computation in suits involving questions of damages growing out of contracts. Provident Life & Accident Ins. Co. v. Globe Indemnity Co., 156 Tenn. 571, 3 S. W. (2d) 1057. Damages are allowable where they are not in fact remote or speculative but are proved to a reasonable certainty, Black v. Love & Amos Coal Co., 30 Tenn. App. 377, 206 S. W. (2d) 432, and under the proof the jury could have found that complainant was entitled to the full amount sued for.

■ Next the defendants complain because the Chancellor excluded the testimony of their witness Joe D. Cochran as to the loss of earnings of the defendant Company during the first six months of 1952. This testimony was properly excluded as the complainant's evidence showed the contract was made in April, 1951, and the rule in this State seems to be that where the purchase price is not paid, as here, the measure of damages is the difference between the contract price and the market value of the stock at the time when it should have been delivered. Doak v. Snapp, 41 Tenn. 180; 18 C. J. S., Corporations, Sec. 414, p. 1001.

■ Next the defendants complain that the charge of the Chancellor was inadequate, incomplete and meager, and did not properly protect the defendants; that the Chancellor did not charge the law and theory of the case, particularly as to the essentials of a binding contract, the Statute of Frauds and its effect on a verbal contract, etc. It appears that the defendants submitted no requests to the Court covering the matters complained of in this assignment.

In numerous decisions, the appellate courts of this state have held that inadequate or incomplete instructions to

the jury are not reversible error when the party affected thereby fails to call the error to the attention of the court, and when adequate and further instructions are not requested. Brakebill & Hamilton v. South Knoxville Contracting & Const. Co., 14 Tenn. App. 531; Langston v. Memphis St. Ry. Co., 14 Tenn. App. 288; Travis v. Bacherig, 7 Tenn. App. 638; Cochran v. Gaither, 9 Tenn. App. 247; Tevis v. Proctor & Gamble Distributing Co., 21 Tenn. App. 494, 113 S. W. (2d) 64; Carney v. Cook, 158 Tenn. 333, 13 S. W. (2d) 322; National Life & Acc. Ins. Co. v. Morrison, 179 Tenn. 29, 162 S. W. (2d) 501. In considering this question our Supreme Court, in Carney v. Cook, supra, [158 Tenn. 333, 13 S. W. (2d) 325], said:

"* * *, counsel engaged in a trial should aid the court by calling his attention to an abstraction or an inadvertence in delivering his instructions to the jury, and, where they fail to do so, this court will not reverse unless convinced that the party complaining was prejudiced by such instruction, or that justice is about to miscarry."

Furthermore, Code Section 10654 provides that no judgment or verdict shall be set aside or new trial granted by any appellate court for error in the judge's charge, unless it shall affirmatively appear that the error complained of affected the results of the trial, and there is no showing here that the alleged error affected the results of the trial.

Next the defendants complain because of the Chancellor's refusal to allow an amendment to the original answer filed in their behalf after motion for a new trial had been filed. By the amendment and exhibits attached thereto, the defendants sought to interpose the additional defense that the contract, when made was in violation of

certain regulations issued under the Federal Defense Production Act of 1950, by Michael V. DiSalle, the then Economic Stabilization Administrator.

■ Amendments may be allowed within the sound discretion of the Court, and it appears to us that the Chancellor did not abuse his discretion in disallowing the amendment for the following reasons: The Defense Production Act became a law in September, 1950, and the regulations relied upon by the defendants were promulgated subsequently thereto. Defendants' answer was filed on September 12, 1952, and the trial started two months later on November 24th. Meantime the defendants knew, or should have known, of the existence of the Act and the regulations promulgated thereunder, but made no attempt to amend their original answer to rely thereupon. If litigants were permitted to amend their pleadings after judgment by alleging matters within their knowledge at the time of the trial or prior thereto, there would be no end to litigation. Under the circumstances we think, as apparently did the Chancellor, that the defendants' application to amend the answer came too late, and the application was properly denied. Amendments may be allowed to set up new matters of defense that have come to a defendant's knowledge since his answer was filed, but when the matter of the amendment is within the defendant's knowledge, as here, the Court may properly refuse to allow amendments after the proof has been heard. Gibson's Suits in Chancery, 4th Ed., Sec. 435, p. 377.

■ Nor will the Courts of this State take judicial notice of the regulations and orders of the various Federal Agencies, including those promulgated under the Defense Production Act of 1950, 50 U. S. C. A. Appendix, Sec. 2061 et seq., when relied upon to defeat an

otherwise valid claim. Evans v. Sheriden, 28 Tenn. App. 90, 186 S. W. (2d) 911..

Finally, the defendants contend that the Chancellor erred in not sustaining their motion for a judgment non obstante veredicto based upon exhibits of the regulations and orders promulgated under the Defense Production Act, which were certified to by Michael V. DiSalle, Economic Stabilization Administrator, and attached to the motion. We find no merit in the defendants' contention for the following reasons: (1) The defendants did not, as previously pointed out, rely upon these regulations and orders in their answer or on the trial of the case; (2) the exhibits relied upon were never introduced in evidence, and (3) "A motion for a judgment non obstante veredicto is a test of pleadings, and is inapplicable when applied to a question of evidence." Citizens' Trust Co. v. Service Motor Car Co., 154 Tenn. 507, 297 S. W. 735. Caruthers History of a Law Suit, 7th Ed., Sec. 391, pp. 425, 426.

This case has been ably presented at the bar of this Court, and it is not without some effort that we have concluded that the assignments are without merit. Therefore, all assignments will be overruled, and the decree will be affirmed at the defendants' costs.

McAmis, P. J., and Hale, J., concur.

## ON PETITION TO REHEAR.

In a petition to rehear, the defendants have respectfully called to our attention two questions which were not specifically considered in our original opinion. These questions are: (1) Did the complaint in his rebuttal testimony repudiate his previous testimony with reference to the alleged agreement, and (2) did the Chancellor

err in overruling the defendants' motion for a new trial on the ground that the contract sued upon was invalid and unenforceable under the Federal Defense Production Act of 1950? These questions were made in the following three assignments of error:

"1. The Court erred in overruling the motion for new trial and the motion for judgment notwithstanding the verdict filed by the plaintiffs-in-error because there was no evidence to support the verdict, and the defendant-in-error admitted that there was no such contract as sued upon. The Court should have sustained the motion for new trial and should have sustained the motion for judgment notwithstanding the verdict. * * *

"2. The Court erred in overruling the motion for new trial and the motion for judgment notwithstanding the verdict filed by the plaintiffs-in-error because there was no evidence to show the statute of frauds has been complied with, and the defendant-in-error admitted that there was no such contract as was sued upon to furnish the foundation for the operation of the rule of part performance within the meaning of the statute of frauds. The Court should have sustained the motion for judgment notwithstanding the verdict. * * *

"3. The Court erred in overruling the motion for new trial filed by plaintiffs-in-error because the contract sued upon was contrary to the Defense Production Act of 1950 of the Congress of the United States as amended, the Executive Orders, proclamations and regulations promulgated under said Act, and contrary to public policy. The Court should have sustained the motion for new trial. * * *"

In support of the first proposition presented on the petition to rehear, as well as by assignments 1 and 2, the defendants rely upon alleged inconsistent statements made by the complainant in his testimony. On direct examination the complainant testified that the verbal agreement to sell him the 300 shares of stock was made in April 1951, before the Park National Bank refused to make the $150,000 loan to Keen, and on rebuttal he testified that a memorandum in his handwriting (defendants' Exhibit No. 19), was made in Keen's office after the date of the Bank's refusal, during negotiations with Keen for the purchase of 500 shares or $50,000 worth of the Company's stock. Because of complainant's admission that the written memorandum was not made until after the Bank's refusal to make the loan, it is insisted that this admission showed that the alleged verbal contract was not only incomplete at that time, but showed that there had never been a meeting of the minds, and that his entire testimony should be disregarded. We find no merit in this insistence as the complainant's admission could not be considered as conclusive in the light of the other portions of his rebuttal testimony, as follows:

"Q. Mr. Buice, during the examination by the defendants of Mr. Keen in this lawsuit, there was introduced here as Exhibit 19 a work sheet, have you ever seen that sheet before? A. Yes, sir.

\* \* \* \* \* \*

"Q. When did you first see that paper, Exhibit 19, on which these figures are on it? A. It was some time before we negotiated the deal with Mr. Scruggs to take his real estate. I mean trade Mr. Keen's real estate and make a deal to close it with Mr. Scruggs.

"Q. That's in your handwriting, it it not? A. Yes, sir.

\* \* \* \* \* \*

"Q. Now Mr. Buice, when was it with reference to the time you were turned down on the $150,000.00 loan at the bank that you were trying to get to buy the Scruggs stock that you saw that, was it after that or before? A. It was afterwards.

"Q. What was the occasion for all these figures put down here on this paper by you? A. Well, Mr. Keen and I was discussing the possibility of trying to raise some money. We were up against a proposition.

"Q. You had been turned down on your loan at the bank? A. Yes, sir. And Mr. Keen asked me if I could raise any money and I told him I didn't know, and he said, 'If you can raise $50,000.00 I will sell you twenty-five percent of this company or five hundred shares of stock for $50,000.00.' I said, 'I don't know whether that is possible or not. I certainly will try it.' I said, 'What could I tell them about our company?' I discussed with him regarding the stock, using it as collateral. He said, 'Sure, you can use it as collateral.' I said, 'I would have to have something, some way of convincing whoever I would borrow the money from the company or stock is worth a certain amount of money.' He said, 'I can give you a statement on it showing what it is worth.' I said, 'I will do all I can. I will try it.'

\* \* \* \* \* \*

"Q. What happened to that paper? A. I gave it to Mr. Keen.

"Q. And that was in the spring of 1951? A. Yes, sir.

"Q. What about this writing, three hundred shares at $100.00 a share, was that on it at that time? A. No, sir.

"Q. Now about $35,000.00, was that on it at that time? A. I don't recall it. I was trying to figure interest about what it would be on $30,000.00.

"Q. You left that with Mr. Keen? A. Yes, sir. I did.

"Q. Did you go and try to raise $50,000.00, Mr. Buice? A. Yes, sir. I did.

"Q. To whom did you go and whom did you talk with about it?

\* \* \* \* \* \*

A. Mr. David Chambers.

"Q. What does he do and where does he live? A. At that time I believe he lived in an apartment on Laurel Avenue and bought a house, and I called him and he come to my home.

"Q. What does he do? A. Professor or Associate Professor at the University of Tennessee.

\* \* \* \* \* \*

"Q. Did you get the money from him or through him? A. No, sir. He tried to obtain it and couldn't get it for me.

\* \* \* \* \* \*

"Q. Was that before you came to your agreement with Mr. Keen on the three hundred shares there on this other contract you related here on direct examination last week? A. Yes, sir.

"Q. Did it become necessary for you to raise $50,000.00? A. No, sir. Not after we negotiated

the deal Mr. Scruggs taking the property and the bank let us have $60,000.00, we worked it out without that.

"Q. Did you tell Mr. David Chambers how much money you wanted to borrow in the first instance? A. Yes, sir. I sure did.

"Q. How much? A. $50,000.00.

"Q. Did you later tell him that you didn't need the money? A. I told him we had worked out a deal with Mr. Scruggs and had been able to purchase the company, and Mr. Keen was selling me three hundred shares of stock for $30,000.00.

\* \* \* \* \* \*

"Q. Was your last conversation with Mr. Chambers about the matter, was that before the deal was closed with Scruggs and Keen and Scruggs Equipment Company? A. Yes, sir.

"Q. Mr. Buice, when were these figures, three hundred shares at $100.00 per share put on there by you, when did you next see that piece of paper? A. When we had our agreement a few days after this occasion here, after we had made other arrangements. I was in Mr. Keen's office and I brought up the stock business again and he said, 'Well, Jack, I am not going to sell you but three hundred shares of stock at $100.00 a share,' and I said, 'I would like to have as much as you would let me have and to show you my good faith I am not scared of it.' He says, 'That's as much as I am going to sell you, three hundred shares at $100.00 a share,' and I wrote it down at the time. \* \* \*''

On cross examination the complainant further testified regarding the written memorandum, as follows:

"Q. When were these figures all written down, written down there in the presence of Mr. Keen? A. Written in his office. I picked up that pad off his desk, that sheet of paper came off of. I am not positive but believe it did.

"Q. When do you say it was with relation to when the Park National Bank turned down Mr. Keen, was it before or after that date? A. What date?

"Q. The day you say Park Bank turned down Mr. Keen? A. I don't recall the date.

"Q. You don't remember whether this was before that date or not? A. It was after that date, before he went to the Hamilton Bank, if I remember correctly.

"Q. You say you don't know the date the bank turned you down? A. I couldn't remember the date on that. There was too much going on around there and I couldn't tell the date. Some time in the early spring.

"Q. At any rate your plans to try to help Keen finance entirely failed, is that right? A. It failed in that source, I tried. * * * "

The following testimony of Dr. David Chambers, Associate Professor of Statistics at the University of Tennessee, corroborates that of the complainant with reference to the attempted loan, the time, etc.:

"Q. Mr. Chambers, tell the Court and Jury whether or not back in 1951 you had a conversation or conversations with Mr. Buice concerning some stock in the Scruggs Equipment Company, and if so, relate to us what that conversation was?

* * * * * *

"A. Yes.

"Q. When was it, Mr. Chambers? A. In the spring of last year, that's the spring of 1951.

"Q. What statements, if any, were made by Mr. Buice to you, and where were you when the statements were made? A. I encountered Mr. Buice late in the afternoon at Ray's Market on Kingston Pike and he walked up to me and said, "Tell me where I can get $50,000.00 right away.' I was quite flattered. I thought he was joking but it developed he was serious and I asked him why he needed this money and he told me Mr. Keen and Mr. Scruggs had agreed on some sort of deal whereby Mr. Scruggs would leave the Scruggs Equipment Company and that the transaction was supposed to be consummated by the payment of a certain amount of cash to Mr. Scruggs by Mr. Keen. He said Mr. Keen had made some trips to the bank to raise money and had been unable to get the funds together and had informed him that if he could raise some money so this deal could go through he would sell him five hundred shares or a quarter interest in the business, in the Scruggs Equipment Company for $100.00 a share, which figured to be $50,000.00. Of course, I had no such sum as that, but I did have a friend here in town who would be capable of making such investments, and I promised Mr. Buice I would contact him immediately and find out whether he would be interested.

\* \* \* \* \* \*

"Q. Later after your friend told you that he had no desire to make such investment, did you later and after that again see Mr. Buice? A. The next time I saw Mr. Buice I told him I was unable to help him raise this $50,000.00.

"Q. About how long was this after your first conversation with Mr. Buice? A. Roughly two weeks.

"Q. What, if anything, did Mr. Buice say to you when you told him your friend would not make the $50,000.00 loan on this stock? A. He said that was alright anyway. He had been working with Mr. Keen and Mr. Scruggs on another type deal, whereby Mr. Scruggs and Mr. Keen were going to exchange something about real estate they owned jointly and they wouldn't require the money they originally needed, but Mr. Keen would let him have some stock anyway. I said, 'What does this mean to you, do you still get the five hundred shares, and he said 'No, three hundred shares,' and I asked if the price was $100.00 a share and he said, 'Yes.'

"Q. Did he say how it was to be payable? A. Be payable over a period of time.

"Q. Do you have any interest in this lawsuit? A. None whatsoever.

"Q. And this conversation you related to the Court and Jury occurred in the spring of 1951? A. That's right."

Thus we conclude that the complainant's alleged contradictory testimony was not fatal, as there was other credible evidence to support his contention that the contract was made in April or the "spring" of 1951.

 The rule is well established in this state that where an interested party in his testimony makes a material statement of fact negativing his right of action or defense, and no more favorable testimony appears, he is bound by it. Johnston v. Cincinnati, etc., Ry. Co., 146 Tenn. 135, 157, 240 S. W. 429; Harris & Cole Bros. v.

Columbia Water & Light Co., 114 Tenn. 328, 341, 85 S. W. 897; McLemore v. Charleston & M. R. Co., 111 Tenn. 639, 69 S. W. 338. However, where there is an explanation, or as here, where other credible evidence is presented, the weight and credibility of the negative testimony becomes a question for the determination of the jury and cannot be determined by the court as a matter of law. See Annotations 80 A. L. R. 627; 169 A. L. R. 798. Furthermore the jury under the evidence presented could have found that they also discussed other matters, including the 500 shares of stock, not made a part of the agreement.

In support of the second proposition presented in the petition to rehear, as well as by assignment 3, the defendants contend that the Chancellor erred in refusing to grant a new trial on the ground that the agreement sued upon was in violation of certain regulations issued under the Defense Production Act of 1950. Exhibits of these regulations were attached to the defendants amended motion for a new trial and were not introduced in evidence. As previously pointed out, the defendants in their answer neither relied upon these regulations nor made any reference thereto during the entire trial of the case, nor is it insisted that these regulations were newly discovered evidence. No showing was made below, and none has been made here as to why this defense was not seasonably interposed, or just why the regulations were not introduced in evidence during the trial.

The Defense Production Act became a law in September, 1950, and the regulations relied upon by the defendants were promulgated subsequently thereto. The original bill was filed on November 24, 1951, to which the Chancellor sustained the defendants' demurrer and the complainant appealed. The action of the Chancellor

was reversed by the Supreme Court on June 7, 1952, and the case was reinstated on the Knox County Equity Docket on August 19th. Defendants' answer was filed on September 12, 1952, and the trial started two months later on November 24th. Meantime the defendants knew, or should have known, of the existence of the Act and the regulations promulgated thereunder, but made no attempt either to amend their original answer to rely thereupon, or introduce the regulations in evidence. We think it a sound rule of law that where a party omits to procure evidence which, with ordinary diligence, he might have procured, his motion for a new trial for the purpose of introducing such evidence should be denied. Zirkle v. Stegall, 163 Tenn. 323, 43 S. W. (2d) 192; Tabler v. Connor, 60 Tenn. 195.

In Tennessee Procedure in Law Cases, it says:

"'Owing to the unusual nature of this application the movent should set forth such circumstances as will relieve himself and his attorney from the implication of negligence in the preparation of his case for trial.

"'This stringent requirement has been imposed and is rigidly observed because of the very wide discretion which trial judges have in dealing with applications for new trials made upon newly discovered evidence. If the circumstances are suggestive of bad faith or lack of diligence upon the part of the movent in the preparation of his case for trial, and particularly in the matter of discovering the evidence relevant to his case, the motion should be overruled. Factors to be taken into consideration are these: the length of time in which a cause has been at issue; the nature and notoriety of the case, particularly

about which the evidence of the absent witnesses is desired; also, everything pertaining to carelessness or lack of diligence or the reverse. If any of the faults in conduct above indicated appear during the deliberations upon the motion, the motion should be overruled. While trial courts are clothed with a very wide discretion in this regard and the failure to grant a new trial upon this ground will seldom be reversed, the appellate courts may, and indeed they should, remand for a new trial where the verdict seems to be unjust and where the loser presents a strong showing of recently discovered evidence for the non-production of which he is not to blame." Sec. 1575, p. 619.

In Zirkle v. Stegall, supra [163 Tenn. 323, 43 S. W. (2d) 193], the Court said:

"The discretion of a trial judge in matters like these is broad, and we could not interfere with the exercise of this discretion by the court below on the showing made here. The affidavits do not disclose sufficient diligence on the part of plaintiffs below. As stated above, this case was tried twice in the circuit court, and it seems to us that, had plaintiffs made sufficient effort, they might have procured on the hearing this testimony, to present which they seek a new trial."

For reasons indicated we are constrained to adhere to the conclusions heretofore reached, and the petition to re-hear will be denied.

McAmis, P. J., and Hale, J., concur.