IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 19, 2002, Session

## ARTHUR INGRAM, JR., ET AL.  v.  BEAZER HOMES CORPORATION d/b/a PHILLIPS BUILDERS, INC.

Appeal from the Chancery Court, Part I, for Davidson County
No. 98-2433-I,  Honorable Irvin H. Kilcrease, Jr., Chancellor

_____

### No. M2001-01641-COA-R3-CV - Filed March 25, 2003

_____

This litigation arises from the 1994 sale of a newly constructed house and lot backing up to a subdivision common area  with an existing natural sinkhole, which is utilized  for surface water drainage from several nearby lots.  During development of the subdivision the defendant filled the area including a portion of the lot purchased by the plaintiffs.  In 1997, the plaintiffs became concerned about the ground settling in their back yard and about perceived dangers of the nearby sinkhole.  They sued the defendant as subdivision developer, house builder, and seller of the property and sought rescission or alternative relief.  The Chancery Court ordered rescission with the plaintiffs recovering the appreciated value at the time of trial and the cost of improvements, plus prejudgment interest on that total, but without any setoff for the rental value during the plaintiffs' occupancy.  We reverse and remand due to errors in the trial court's calculation of the amount payable upon rescission and related issues.  While we could affirm the rescission, we are reluctant to limit the parties and the trial court to that remedy, since we anticipate additional proof by the parties and a significantly different result upon remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed and Remanded**

ROBERT L. JONES, Sp. J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J.,M.S., and WILLIAM C. CAIN, J., joined.

Todd E. Panther, Nashville, Tennessee, for Appellant, Beazer Homes Corporation, d/b/a Phillips Builders, Inc.

Paul T. Housch, Nashville, Tennessee, for Appellees, Arthur Ingram, Jr., et al.

**OPINION**

This civil action arises from the 1994 sale of a newly constructed house and lot backing up to a subdivision common area with an existing natural sinkhole, which is utilized for surface water drainage from several nearby lots. During development of the subdivision and before being seen by the plaintiffs, the defendant had placed large crushed rock in and near the sinkhole and filled the area including a portion of the lot purchased by the plaintiffs. In 1997 state environmental authorities became concerned that sediment was getting into subsurface water through other sinkholes in the subdivision and met with the homeowners' association, which owned the common areas with all sinkholes.

The plaintiffs became concerned about the ground settling in their back yard and about perceived dangers of the nearby sinkhole. In 1998, they sued the defendant as subdivision developer, house builder, and seller of the property and sought rescission or alternative relief. The Chancery Court ordered rescission with the plaintiffs recovering the appreciated value at the time of trial and the cost of improvements, plus prejudgment interest on that total, but without any setoff for the rental value during the plaintiffs' occupancy. The defendant appeals and contends that an adequate legal remedy made rescission inappropriate or, in the alternative, that the amount to be paid to the plaintiffs for rescission was not properly calculated. We reverse and remand due to errors in the trial court's calculation of the amount payable upon rescission and related issues. While we could affirm the rescission, we are reluctant to limit the parties and the trial court to that remedy, since we anticipate additional proof by the parties and a significantly different result upon remand.

I.      FACTS AND PROCEDURAL HISTORY

This case involves Lot 11 of Brandywine Subdivision developed by the defendant, Phillips Builders, Inc., near Smyrna in Rutherford County, Tennessee.[1] The subdivision land had a number of natural sinkholes. The defendant located the streets and the lots in such a way as to minimize the effects of the sinkholes, which were primarily limited to common areas owned by a homeowner's association. Besides being the subdivision developer, the defendant was also constructing and selling houses in the subdivision.

According to the expert witnesses for both sides, sinkholes are common in the central basin area of middle Tennessee and often serve as a natural drain for surface water. In fact, during the development of this subdivision, governmental authorities expressly approved the use of sinkholes in this subdivision as a means of providing for the drainage of surface water from lots and streets.

Before the trial of this case in March of 2001, the defendant had developed 20 to 25 subdivisions in the previous fifteen years and had constructed 4,000 to 4,500 homes. Sinkholes had

---

[1] Beazer Homes Corporation is mentioned only in the original pleadings and apparently is the parent of Phillips Builders, Inc.

been encountered by the defendant in a number of other subdivisions, but no sinkhole has ever affected a house built by the defendant.

In November 1994 the plaintiffs, Arthur and Brenda Ingram, looked at, and signed a contract to purchase Lot 11 in Phase I of Brandywine Subdivision with a house nearing completion. With the help of a mortgage loan, the plaintiffs paid $118,635, which included $1,000 as a "premium" due to Lot 11 backing up to a common area with trees, rather than to the back of another lot. The plaintiff closed their transaction December 16, 1994, and immediately moved into the house.

While the sales representative gave the Ingrams a "map" of the subdivision, the map did not show sinkholes nor were the Ingrams otherwise made aware of the presence of a sinkhole in the common area immediately behind their lot. They testified they did not know of the existence of the sinkhole until April 1997.

The first dispute between the parties arose in 1995 when the development of Phase II of the subdivision resulted in the removal of many trees, which Phillips' sales agent and the plaintiffs had previously thought were in the common area, but were in fact on the rear of a lot in Phase II being developed across the narrow common area from the plaintiffs' back yard. Rock and soil were placed in and around the sinkhole depression in the common area as the lots in Phase II were being excavated. Later erosion and settlement of that rock and soil in the sinkhole area resulted in the second and more serious dispute between the parties in 1997.

In response to the 1995 removal of trees, the plaintiffs had an attorney, James Cope, write the defendant October 5, 1995, requesting that the defendant refund the $1,000 lot premium because the trees had been removed. The defendant contended in response that the plaintiffs' lot was still "premium" to some extent because of the adjoining common area, and the parties agreed upon a $500 refund which was paid by the defendant and accepted by the plaintiffs, thereby reducing the purchase price to $118,135.

In April 1997 a representative of the Tennessee Department of Environment and Conservation met with the subdivision's homeowners association to discuss sediment runoff getting into underground water through certain sinkholes. The Department was not then concerned about the sinkhole behind Lot 11, but the plaintiffs attended that association meeting and testified that was their first knowledge of the existence of that sinkhole.

Thereafter, the plaintiffs became concerned about depressed areas in their rear yard, about a knee-deep hole developing near their rear lot line, and whether the sinkhole was expanding onto their property and toward their house. It was not established whether the hole was on the plaintiffs' lot, in the common area, or on the boundary between the two.

After the April 1997 meeting, the plaintiffs had an attorney, Arnie Martin, send a letter asking that something be done about the sinkhole. The defendant responded that the sinkhole was small, stable, and performing as it should, but agreed that the area around it needed the exposed rock removed and re-seeding. By a letter dated July 30, 1997, the plaintiffs and their third attorney,

Robert Notestein, requested that Phillips repair the sinkhole or trade the plaintiffs a new house and lot. This was the first mention of anything akin to rescission.

After the parties could not agree on what should be done to the sinkhole area, the plaintiffs hired their fourth attorney, Gina Lewis, who filed a lawsuit in the Chancery Court of Davidson County on August 11, 1998.[2]

After two scheduling orders and the plaintiffs employing their fifth attorney, Paul T. Housch, they employed Geotech Engineering Company, Inc., and its professional engineer, Louis Mishu, to "obtain site-specific subsurface data in the back yard, between the house and the sinkhole . . . to determine the likelihood that the sinkhole will migrate into the yard and possibly compromising the foundation of the house."

Geotech's subsurface investigation included three trenches dug with a backhoe and identified as Test Pits 1, 2, and 3. That work was done January 31, 2000. Test Pit 1 was 45 feet long across the back yard and parallel to the back of the plaintiffs' house. The report shows that portion of Lot 11 had up to five feet of fill on top of the natural topsoil and that the fill material included trash, vinyl siding, other construction debris, and parts of trees. Geotech's second test pit near the boundary with the common area revealed approximately 2½ to 4 feet of fill above the natural topsoil. The third test pit in the front yard of Lot 11 showed less than a foot of fill material.

Geotech concluded that the fill material in the Test Pit 1 area was unsuitable and that the organic material in that fill would continue to decompose over time causing further settlement in the back yard The report recommended that the material be removed and replaced with suitable soils and adequately compacted to reduce the risk of future soil collapses in the back yard area. The report, dated February 10, 2000, also stated the following:

> From this field investigation, it appears that the probability that the sinkhole behind the house affecting the house is low. There was no visible crevice seen during the trenching across the back yard. Also, no depressions or sinkholes were observed in the front yard and on the east and west sides of the house. However, in our opinion, it is unlikely that a sinkhole exists on the Ingram Property. There is always a risk of sinkhole development in this area that the owner should take. The risk of sinkhole development is not higher at this property than at the other houses in this subdivision.

The Ingrams moved to amend their complaint on April 14, 2000, after learning of the improper fill and its contribution to the settling of their back yard. Phillips Builders argued that Tenn. Code Ann. § 28-3-202 prohibited such claim more than four years after the closing on December 17, 1994. The trial court properly allowed the amendment to relate back. The discovery of the concealed fill material during trial preparation was merely another explanation for the settling problem which was the basis of the original complaint

---

[2] No issue has been raised about venue.

Mr. Mishu testified for the plaintiffs at the trial and said he saw "saucers" in the back yard and thought they were the beginnings of sinkholes, but later discovered that they were caused by the decomposition of the improper fill. He testified on direct examination that he did locate what he called a sinkhole dropout about two feet wide and two feet deep on the boundary between the plaintiffs' lot and the common area, which he thought indicated the sinkhole was expanding. From the context of the entire record it appears more likely that the hole described by Mr. Mishu resulted from soil eroding around and through large crushed rock that was used in 1995 in the sinkhole area when Phase II was developed and the trees were removed in or near the common area. Neither party had any digging done around that hole near the property line to make a more specific determination of whether it was related to improper excavation and fill or was related to the sinkhole.

Mr. Mishu was properly permitted to give his opinion about the cost of removal and replacement of the improper fill, along with topsoil and re-seeding, which he estimated would cost $12,000. That same cost figure was used by the plaintiffs' real estate appraiser in lowering the value of the property $12,000 below what comparable sales suggested it should be worth without the improper fill and the sinkhole.

A witness for the defendant testified that the improper fill could be removed for as little as $1,500 and that the plaintiffs' depressions and the hole were caused by the improper fill and not by any expansion of the sinkhole.

After a three-day trial, the chancellor suggested the attorneys submit proposed findings of fact and conclusions of law. The trial court adopted all 84 of the plaintiffs' proposed findings of fact and adopted fifteen of the sixteen conclusions of law proposed by the plaintiffs, rejecting only proposed conclusion 14 regarding concealment, intentional misrepresentation and the awarding of punitive damages.

The plaintiffs' proposed findings, though not fully supported by the preponderance of the evidence, were adopted verbatim in the trial court's final judgment. Specifically, the evidence shows the depressions between the plaintiffs' house and rear lot line and the hole near that line to be a result of decomposing fill and of the settling and erosion around the crushed rock, rather than an expansion of the sinkhole itself. Therefore, the findings of fact and conclusions suggest the sinkhole to be far more serious and threatening than the actual evidence in the trial.

The plaintiffs testified the value of their property at the time of trial was $145,000 to $150,000. Their appraisal expert testified the property would have been worth $133,000 without the sinkhole and bad fill, but was worth only $121,000 with those alleged defects. The plaintiffs itemized $12,535 spent on alleged interior and exterior improvements since the 1994 closing. The trial court adopted proposed findings and conclusions which allowed the plaintiffs to recover $145,000 plus the actual costs of improvements, or a total of $157,535, even though the market value, if any, of those improvements should already be included in the $145,000, which is certainly generous in light of the opinion of the plaintiffs' own expert.

-5-

The trial court also ordered that the plaintiffs recover prejudgment interest in the amount of $98,837.00, which was calculated at the rate of 10% from the closing of December 16, 1994, to the last day of the trial, March 26, 2001. That amount was supposedly figured on the $157,535.

The prejudgment interest recovery exceeds the plaintiffs' actual mortgage principal and interest payments of $75,392.72, real estate taxes of $6,765.64, mortgage insurance premiums of $3,491.59, flood insurance of $2,226.50, and homeowners association dues of $720.00, for a combined total of $88,596.45. The trial court's prejudgment interest award therefore exceeded by more than $10,000 the amount of the plaintiffs' actual expenditures, a portion of which reduced their mortgage indebtedness. If there is to be rescission, the plaintiffs would recover the principal portion of all mortgage payments when paying off the reduced debt out of rescission proceeds.

The record does not include any evidence of the fair rental value of the property between closing and trial. The failure of the parties to offer evidence of rental value suggests that neither expected rescission to be ordered or that they overlooked the case law regarding rescission when property was occupied and used by the purchasers.

## II.     STANDARD OF REVIEW

Tenn. R. App. P. 13(d) establishes that this court shall conduct a *de novo* review of findings of fact by the trial court in a non-jury trial, with the trial court's findings accompanied by a presumption of correctness, unless contrary to the preponderance of the evidence.

This court also gives great weight to a trial court's factual findings that rest on determinations of credibility. *Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). However, if the trial judge has not made a specific finding of fact on a particular issue, this court may review the record to determine where the preponderance of evidence applies without applying a presumption of correctness. *Devorak v. Patterson,* 907 S.W.2d 815, 818 (Tenn. Ct. App. 1995).

While the appellate courts review findings of fact with a presumption of correctness, conclusions of law are reviewed *de novo* without any such presumption. *Hawks v. City of Westmoreland*, 960 S.W.2d 10 (Tenn. 1997); *Nutt v. Champion International Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998).

In reviewing a trial court's decision, this court has the responsibility to apply the controlling law, whether or not cited or relied upon by either party. *McClain v. Kimbrough Construction Co.*, 806 S.W.2d 194 (Tenn. Ct. App. 1990).

Finally, if a finding of fact is based on undisputed evidence that can reasonably support only one conclusion, an appellate court will review that finding without a presumption of correctness. *Hamblen County Educational Association v. Hamblen County Board of Education,* 892 S.W.2d 428, 431 (Tenn. Ct. App. 1994).

In applying the foregoing principles, this court is mindful that the trial court's findings of fact were a verbatim adoption of 84 paragraphs drafted by the plaintiffs' counsel. A trial court's findings and conclusions must be its own. Suggested findings and conclusions by counsel can be of assistance to the trial court, but findings prepared by the trial judge which represent his independent labor are preferable. Before adopting findings prepared by counsel, the trial judge should carefully examine them to establish that they accurately reflect his views and conclusions, and not those of counsel, who are naturally biased . *Delevan-Delta Corp.* v. *Roberts*, 611 S.W.2d 51, 52-53 (Tenn. 1981).

III.    LAW AND ANALYSIS

The principal issue presented by this appeal is whether rescission was appropriate under the facts of this case. Tenn. Juris. *Rescission, Cancellation, and Reformation*, generally states the Tennessee law on rescission as follows:

> A "rescission" amounts to the unmaking of a contract, or an undoing of it from the beginning . . . . It is the annulling, abrogation of the contract and the placing of the parties to it in status quo. It necessarily involves a repudiation of the contract and a refusal of the moving party to be further bound by it. *See id. § 2.*
> 
> * * *
> 
> If the parties cannot be put in status quo, or if, due to the passage of time, etc., equity cannot be done, there is no ground for rescission. Thus, a contract will not be rescinded if the parties cannot be placed in status quo. *See id. § 10.*
> 
> * * *
> 
> Where the vendee elects to treat the contract as closed and absolute, and sues for breach of warranty, the measure of damages is the difference between the value of the property contracted for and that delivered . . . . *See id. § 14.*
> 
> * * *
> 
> Any conscious recognition of the contract as binding with knowledge of the fraud bars the right of rescission. Thus, a party, after having filed a suit for rescission, may by his subsequent actions inconsistent with his prayer for rescission, thereby affirm the voidable transaction and bar himself from his pending claim for rescission. . . .  A failure to rescind with reasonable promptitude amounts to affirmation of the contract. *See id. § 15.*

In *Fullington v. Meadows, Inc.,* No. 03A01-9212-CA-00439, 1993 WL 166287 ( Tenn. Ct. App. May 18, 1993), there was a sink or depression along the side lot line between Lots 8 and 9 of a residential subdivision. Witnesses familiar with the history of the land testified that area previously had an open sinkhole in which trash had been placed. When the subdivision was developed, the area was merely a low place surrounded by small locust trees. Fullington bought Lot 8 and built and occupied a house thereon. Lot 9 was sold to another person named Setsor, but remained unimproved and vacant. After heavy rains a hole of significant size opened between the two lots, and rescission of both transactions was ordered and affirmed on appeal. Fullington had purchased the vacant lot

for $8,000 and spent $61,000 for erection of a house and was allowed to recover the full $69,000. The owner of Lot 9 was awarded his purchase price of $12,500.

The trial court's granting of prejudgment interest in *Fullington* was reversed for the following reasons:

> We must respectfully disagree with the chancellor's exercise of discretion in this case. The chancellor specifically noted that there was no intentional fraud on the part of the defendant. The record reflects that the Fullingtons have been able to live on the property, although perhaps not able to enjoy it to its fullest extent. At any rate, no allowance was made for Fullington's occupancy and use of the property. Under the circumstances, equity would seem to demand that no award of interest be made on top of the free use of the property. As to Setsor [owner of Lot 9], there is nothing in the record to indicate that Setsor made any attempted use of the property as impaired, nor was there any proof that any sales efforts were made and thwarted by the defect in the property. From our view of the record in this case, the equities do not justify an award of prejudgment interest.

The *Fullington* case involved a defect in the property itself, which "seriously and substantially impaired the use of the property as residential lots." In contrast, the sinkhole in the common area behind the Ingrams' lot only slightly, if at all, affects their settling and erosion problems, which are caused primarily by the improper fill.

*Isaacs v. Bokor*, 566 S.W.2d 532 (Tenn. 1978), affirmed rescission and the purchasers' recovery of the purchase price and value of improvements less any use or rental value of the property. That case arose from that defendant's sale of a multi-acre tract of land and contract to build the plaintiff a residence upon that land. Unfortunately, the building site agreed upon before the contract and closing, where construction of the residence began after closing, was on an adjoining tract owned by a non-party. The *Isaacs* opinion has a thorough discussion of the alternative remedies available to a purchaser who is the victim of a misrepresentation or who has been induced to contract through a mistake of material facts, and is frequently quoted as follows:

> It is too narrow a view to state that a vendee, upon rescission, is limited solely to the purchase price which he paid for the property. Where he has changed his position and made improvements, he may well be entitled to recover for their value, although, in attempting to restore the parties to their former status, courts may require the vendee to account to the vendor for the use or rental value of the property, to convey improvements to him, and to restore to the vendor anything of value which the vendee has received from him in the rescinded transaction.

566 S.W.2d at 540.

Rescission is an equitable remedy and is not enforceable as a matter of right but is a matter resting in the sound discretion of the trial court, and the court should exercise the discretion

-8-

sparingly. Thus the question before this appellate court is whether the trial court abused its discretion in granting rescission. *Vakil v. Idnani,* 748 S.W.2d 196, 199-200 (Tenn. Ct. App. 1987).

In *Harrison v. Laursen,* No. 01A01-9204-CV-00177, 1992 WL 301309 (Tenn. Ct. App. Oct. 23, 1992), this court stated:

> The remedy of rescission involves the avoidance, or setting aside, of a transaction. It usually involves a refund of the purchase price or otherwise placing the parties in their prior status. *Mills v. Brown*, 568 S.W.2d 100, 102 (Tenn. 1978). Damages for breach of contract, on the other hand, place the injured party, as nearly as possible, in the same position he would have been if the contract had been performed. *Wilhite v. Brownsville Concrete Co., Inc.*, 798 S.W.2d 772, 775 (Tenn. App. 1990).
>
> Because these remedies are inconsistent, it is necessary for the injured party to elect which remedy to pursue. The law does not allow one to repudiate a contract on one hand and claim the benefits of the contract on the other. *Isaacs v. Bokor*, 566 S.W.2d 532, 537-38 (Tenn. 1978).
>
> * * *
>
> . . . . When rescission is granted, the seller is entitled to compensation from the buyer for use of the real estate. Such damages are normally measured by the rental value of the property while the buyer had the property in his possession or under his control. *Isaacs v. Bokor*, 566 S.W.2d 532, 540. . . . However, such damages cannot be speculative; instead, they must be proven with reasonable certainty. *Buice v. Scruggs Equipment Co.*, 37 Tenn. App. 556, 571, 267 S.W.2d 119, 125 (1953).
>
> In the present case the Harrisons [sellers] have failed to present any proof as to the rental value of the property. The lower court's award of the mortgage payments appears to represent a convenient figure chosen because it was available. Without proof a finding that such payments were equivalent to the rental value of the property would be based on pure speculation.
>
> Although we do not ordinarily give a party a second chance to prove his damages, whole justice would not be accomplished in this case if the Laursens [buyers] could recover the amounts they had paid and were not required to reimburse the Harrisons for the use of the land. Thus, we remand the case to the lower court in order to give the Harrisons the opportunity to present proof concerning the rental value of the property while the property was in the Laursens' possession. In determining the amounts owed to each party, the lower court should take into account the matters discussed below.
>
> * * *
>
> Under certain circumstances the buyer is entitled to recover the value of any improvements to the property. *Estate of Minton v. Markham*, 625 S.W.2d 260, 262 (Tenn. 1981). The measure of compensation is the enhanced value of the land in the market as a result of the permanent improvements estimated at the time the election of rescission was made. *Masson v. Swan,* 53 Tenn. 450, 456 (1871).

* * *

In summary, we hold that the Laursens are entitled to recover the amounts paid on the purchase price plus the taxes. The Harrisons are entitled to be compensated for the use of the land while it was in the Laursen's [sic] possession. If the changes made on the property by the Laursens increased its value, they are entitled to the increase; if the changes caused the property to depreciate, the Harrisons are entitled to recover the amount of the depreciation.

In the case of *Campbell v. Lane*, No. 03A01-9205-CH-00179, 1992 WL 335947 ( Tenn. Ct. App. Nov. 18, 1992), rescission was denied because the plaintiffs continued to live in the residence and make mortgage payments to their vendors after the alleged rescission, thereby nullifying their attempted rescission by their subsequent acceptance of benefits growing out of the contract. However, it was not practical for the Ingrams to cease payments and vacate the property because their mortgage payments were not owed to the defendant.

With regard to the prejudgment interest issue, Tenn. Code Ann. § 47-14-123 (2001) provides that such interest, when permitted by law,  "<u>may</u> be awarded . . . . in accordance with principles of equity at <u>any rate not in excess</u> of a maximum effective rate of ten percent (10%) per annum." (Emphasis added.)

In this case, the Ingrams cannot recover any prejudgment interest for the period they occupied and used the property, unless, and only then to the extent, they can show that their actual interest, taxes and other ownership expenses exceeded the rental value of the property.  Neither may they recover the appreciation in value attributable only to the passage of time.   Such appreciation is inconsistent with the restoring of the parties to the status quo existing at the time of the sale.  The Ingrams may recover only the $118,135 purchase price plus the amount by which their alterations increased the fair market value of the property.  If their alterations decreased the market value of the property, such decrease would be deducted.  There is no authority for adding actual costs of such alterations.  If these limitations produce a harsh result, then the Ingrams should on remand elect damages over rescission.

## IV.    CONCLUSION

This court concludes that the sinkhole has only a slight, if any, effect on the rearmost portion of the plaintiffs' lot and has no effect whatsoever upon the remainder of the lot, the house and other improvements.  However, the continued natural use of the sinkhole as a method of disposing of surface water combines with the improper and decomposing fill material on Lot 11 to constitute a sufficient defect justifying rescission.  Neither alone would be sufficient, especially after the passage of so much time before rescission was suggested and with the likelihood of an adequate alternative remedy.  Even though this court concludes that rescission may be justified and could be affirmed, this case must be remanded to the trial court for further proceedings on several issues.

First, the trial court ordered the defendants to pay the appreciated value of the property, which included the value of any improvements, and then added the actual cost of those same

-10-

improvements. As indicated by the foregoing cases, rescission normally requires reimbursement of the purchase price, adjusted by the amount by which the vendees' alterations increased or decreased the market value of the property. The vendees' actual costs for such alterations are relevant only in supporting or disputing their effect on market value. By adopting the plaintiffs' proposed findings and conclusions, the trial court effectively required payment for both the cost and the market value of the improvements, plus prejudgment interest on both from the closing date, without any regard for when the improvements were made.

Secondly, the prejudgment interest was calculated on the appreciated value from the date of closing, when any such appreciation likely occurred gradually over the six-plus years between closing and trial. That method of calculation effectively resulted in something akin to an improper compounding of interest on any amount above the purchase price. See, *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439 (Tenn. 1992).

Thirdly, and most importantly, the trial court ordered prejudgment interest at the maximum discretionary rate from the December 1994 closing on the transaction without offsetting or taking into consideration the rental or use value of the property since that time. If this property had been vacant and of no use to the plaintiffs during their ownership, prejudgment interest on the purchase price might be appropriate. However, such would be a windfall to the plaintiffs who have continued to use the property as their residence since 1994, unless there is a setoff for the rental value since that time. This court assumes that the mortgage interest, real estate taxes, and homeowner association fees would approximately equal the fair market rental value for the property since closing, but the parties will be permitted to offer evidence on this issue on remand.

Fourthly, in this case, the trial court's use of the statutory maximum 10% rate for prejudgment interest resulted in an amount that far exceeded the total of all of the plaintiffs' actual payments for interest and principal on their mortgage, for real estate taxes, for mortgage insurance premiums, for flood insurance, and for homeowners association dues. Such is contrary to the spirit of Tenn. Code Ann. § 47-14-123 (2001), the holding in the *Fullington* case, and equity principles in general.

This court has been confronted by the dilemma of choosing between one of the following: (1) find rescission inappropriate because the off-site sinkhole had little or no impact and the improper fill could be remedied with damages up to $12,000; or (2) affirm the rescission for $118,135 without additional compensation for alterations or prejudgment interest; or (3) affirm the rescission, but remand for determination of the appropriate amount, after reopening proof for offset of rental value against the plaintiffs' ownership interest and expenses; or (4) remand all issues, including rescission, for reconsideration in accordance with this opinion and new evidence on reopening the proof of both parties.

The *Campbell* case and the general law of rescission is precedent for the first option of denying rescission in this case and limiting the plaintiffs to damages only. The *Fullington* case is precedent for the second option of merely vacating the award of prejudgment interest and affirming the rescission for $118,135. The *Harrison* case is precedent for the third option of affirming rescission but remanding for the parties to reopen their proof for offsetting claims of interest and

expenses incurred by purchasers against the rental value of the property and whether alterations increased or decreased the property value. Even though the defendant did not offer any evidence of rental value at the trial, the defendant would be entitled to offer such proof upon remand.

We believe the fourth option is the one most likely to produce a just result to this litigation. The trial court need not begin anew, but can hear additional evidence from both parties, make some preliminary findings of fact and conclusions, and let the parties argue between the adequacy of damages and necessity of rescission. Even if the trial court concludes rescission is still an appropriate remedy, the plaintiffs may conclude the recovery is too limited at this time and prefer to retain their property and recover damages adequate to rework their back yard or as compensation for retaining it as is. Normally, an election must be promptly made as to whether the purchasers reject the contract and seek rescission versus retaining the property and seeking damages. Here, however, the election could be after the close of additional proof on remand, because the improper fill was not discovered as a cause of the problems until five years after closing and well into this litigation.

Assuming that fair market rental value may equal or exceed actual ownership interest and expenses, the plaintiffs could conclude that rescission is not in their best interest, and they may elect to instead seek damages for the estimated excavation, removal, refilling, top dressing, and seeding of their back yard so as to give them the benefit of their bargain. It may be appropriate on remand for the trial court to decide the appropriate amount payable by the defendant for rescission versus the appropriate amount recoverable by the plaintiffs for damages in lieu of rescission. The plaintiffs could then make an election of which remedy they prefer.

Since it appears the plaintiffs are entitled to ultimate relief, but the defendant was entitled to relief from the trial court judgment, the costs in this court are adjudged one-half against the plaintiffs and one-half against the defendant.

_____
ROBERT L. JONES, SPECIAL JUDGE