IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 31, 2011 Session

## CHARLES PESCE v. EAST TENNESSEE CONSTRUCTION SERVICES, INC.

**Appeal from the Circuit Court for McMinn County**
**No. 25444      J. Michael Sharp, Judge**

_____

**No. E2010-01071-COA-R3-CV - Filed February 28, 2011**

_____

Charles Pesce ("the Owner") is a practicing dentist.  He contracted with East Tennessee Construction Services, Inc. ("the Builder") to build him a new office for his practice on a lot owned by him.  The Builder constructed the building, but with numerous undisputed defects. The Owner filed this action which culminated in a bench trial that lasted several days.  Based upon diminution in value, the trial court awarded the Owner $282,000 in damages.  The trial court expressly found that the cost to repair the structure was an unacceptable measure of damages because it "is disproportionate . . . to the difference in the value of the structure actually constructed and the one contracted for."  The court awarded the Owner discretionary costs of over $10,000.  The Owner appeals challenging the measure of damages as well as the amount awarded under the diminution in value measure.  The Owner also challenges the trial court's failure to order the Builder to reimburse him for fees charged by one of the Owner's experts in connection with his discovery deposition taken by the Builder.   The Builder challenges the award of discretionary costs and argues that the damages awarded are excessive.  We reverse in part and affirm the remaining judgment as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed in Part; Remaining Judgment Affirmed as Modified;
Case Remanded with Instructions**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., joined.  D. MICHAEL SWINEY, J., filed a separate concurring opinion.

D. Mitchell Bryant, Athens, Tennessee, for the appellant, Charles Pesce.

Jerry M. Martin, Knoxville, Tennessee, for the appellee, East Tennessee Construction Services, Inc.

# OPINION

## I.

It is undisputed at this stage of the litigation that the parties had a verbal contract for the Builder to construct a dental office for the Owner on the latter's lot. It was a cost plus contract. The only plans were sketches by the Builder and drawings prepared by suppliers of furnishings and fixtures for the office. Also, various components came with manufacturer's installation instructions and sketches. For example, the "Andersen" windows called for flashing and caulking around the perimeter of the windows. It is undisputed that the Builder constructed a building with numerous code violations and structural deficiencies. The primary problem with the building is water leakage into the interior of the building with resulting mold and mildew. Some of the water leakage appears to have come from around windows that were not properly flashed and caulked. Much of the water leakage is into the basement itself because of improper flashing and water-proofing around the perimeter of the basement. The basement is the same size as the primary floor of the building, *i.e*, 2750 square feet. Originally, one-half the basement space, or 1375 square feet, was to be finished to office grade space. The basement as constructed, has some interior walls but is otherwise unfinished. Because of the water problems, the basement can only be used for storage. Another major problem with the building is that the structural floor trusses are installed below ground level. At the time of trial, repairs had not been made, but the Owner had, for several years, been using the building as the site of his profitable dental practice.

The Owner hired numerous experts in an attempt to prove his case. One of the experts is Mr. Faris Eid. The Builder took Mr. Eid's deposition over the course of two days. On the first day, the Builder asked Mr. Eid to provide copies of all his files in the case, including any remedial plans and all his computer files. Mr. Eid informed the Builder's counsel that it would take several days of work to locate, copy, and organize all the material he had requested, especially since it required revisiting computer web sites. Nevertheless, the Builder insisted on the copies. Mr. Eid, with the help of his office staff, complied. They assembled in excess of 1500 documents over the course of several days and produced them at which time the deposition was resumed and completed on the second day.

Mr. Eid sent a bill in the amount of $6,667.46 directly to the Owner, who, through his counsel, presented the bill to counsel for the Builder for payment. The Builder refused to pay the bill. The Owner then filed a motion with the court requesting that the Builder be compelled to pay the bill. The bill is attached to the motion. It reflects a total of 23 hours for the witness at the rate of $200 per hour, approximately $300 for staff work, 1335 pages of color copies at the rate of $1.00 per copy, and approximately 3400 pages of black and

white copies at a rate of an average of approximately 12 cents per copy. Upon hearing the motion, the court found

> there was an implied agreement for the [Builder] to pay reasonable fees to [the Owner's] expert, Mr. Faris Eid . . ., for making [himself] available at the request of the [Builder], for a discovery deposition. [The Owner] is entitled to immediate reimbursement for those fees which he has already paid.

The court found that the portion of the bill already paid by the Owner that was ripe for reimbursement was "the amount of $1,582 consisting of 7.91 hours for actual deposition time at $200 per hour." The court further ordered "that the balance of the Motion to Compel Payment and for Costs and Fees related to the remainder of the billing submitted by Mr. Eid for deposition preparation time, as well as the time of other individuals at his firm, used to copy and collate various documents requested by the [Builder], as well as costs for bringing this Motion shall be deferred until time of further hearing in this cause." The court specifically noted that the reimbursement the Owner was requesting did not qualify as discretionary costs under Tenn. R. Civ. P. 54.

The record does not reflect any effort by either party to bring the unresolved issue to the court's attention until the hearing on the Owner's motion for discretionary costs. At that juncture, the Owner included Mr. Eid's fees and expenses for which he had not been reimbursed in his request for discretionary costs. At the hearing on the motion, the Owner renewed his request that he be reimbursed for the remainder of his payment of Mr. Eid's bill, without regard to whether it was called discretionary costs or something else. Specifically, counsel argued:

> Obviously, the full amount has been paid by [the Owner] to Mr. Eid for that. The [Builder] has paid the $1582, or reimbursed that . . . they were ordered to pay. And we are asking, whether it be in the nature of discretionary costs or just regular [litigation] costs, we are asking for the balance of $5085.46 to be . . . reimbursed to Dr. Pesce. . . . [I]t was [done] at the [Builder's] request and demand. . . . .
>
> . . . . So, that's why I'm saying, you can look at it, I guess, as a discretionary cost or you can look at it as just a litigation cost based upon demands made by the [Builder] that were not paid.

In its memorandum opinion on the issue of discretionary costs, the court stated,

> With regard to. . . the expert fees paid to Mr. Faris Eid, this court finds that the $1,582 already paid to Mr. Eid is a recoverable discretionary cost. . . . . This court holds that any other fees paid to Mr. Eid should not be recoverable, given the facts and circumstances of this case, and given the limitations of Tennessee Rule of Civil Procedure 54.02(2).

In its final order, the court stated its denial in slightly different terminology.

> The Court further finds that [the Owner] is entitled to recover the sum of $1,582 for expenses incurred related to Mr. Eid's deposition, and that said amount of $1,582 has already been reimbursed to him by the [Builder].

The Owner chose to present his case, and specifically the issue of damages, from the perspective of cost of repair. The Owner did not present proof of diminution in value and neither did the Builder. In fact, the Builder's only witness as to the value of the building made his appraisal without inspecting the interior of the building and based his appraisal on a street-side inspection with the assumption that the building's condition was "good with no deficiencies." After hearing proof for approximately seven days, the court expressed its concern that the cost of repairing the building could well exceed what it cost to build it. Out of concern that the cost of repair would prove unreasonable and disproportionate to the diminished value of the structure, the court ordered the parties to present proof of the diminution in value as an alternative measure of damages under *Wilkes v. Shaw Enterprises, LLC*, No. M2006-01014-COA-R3-CV, 2008 WL 695882 (Tenn. Ct. App. M.S., filed March 14, 2008).

The court convened a hearing on June 23, 2009, to hear proof on diminished value. The Builder's only live witness, Mr. Cobble, testified that diminished value should be calculated by simply subtracting the cost of repair, which he placed at $107,451, from the normal market value of the structure, whatever that value was. Mr. Cobble made it clear that he did not attempt to value the building, either in its supposed-to-be constructed state or its unrepaired state.

The primary focus of the proof became the testimony of Bryan Glascock. It was his testimony that the court used as the basis for its findings related to damages. Glascock is a commercial real estate appraiser, a real estate broker, and a real estate auctioneer, who has been in the real estate business for 36 years. He is also licensed in Tennessee to do property

tax appeals. Glascock inspected the building inside and outside and had numerous conversations with the Owner about the building. He also reviewed all of the drawings and sketches, such as they were. He based his appraisal of diminished value upon the actual building, as is with its numerous defects, compared to a hypothetical building, "built to code [with] no deficiencies, no leaks." He based his values on two valuation methods, the first being sales of comparable structures and the second being a cost to build the structure. According to Glascock the two methods, as applied to the facts of this case, produced similar figures. Glascock readily admitted that he did not find sales of dental offices, so he used sales of other commercial offices, including medical offices and retail stores, as comparables. Also, he admitted that his cost figures were based on a computer program using low grade or deficient quality to produce the as built cost, and higher grade material to produce the hypothetical building that the Owner expected based upon the contract for a dental office. He also admitted that his methods produced a "wide range of values for buildings that are well-built and well-designed, and then a range of values for buildings that are not so well-built or maybe older or not really as well located." Glascock testified that his appraisals are "90 percent accurate." The "bottom line" was a value of $722,000 for the hypothetical building without deficiencies and $275,000 for the building as is. He explained in direct that the latter figure was produced by multiplying the ground floor area of 2750 square feet, by a value of $100 per square foot, to arrive at $275,000. He did not explain in direct how he arrived at the calculation of $722,000 other than to say he based it upon a fully finished ground floor and a basement of the same size with only one-half of the basement area finished.

On cross-examination, Glascock was asked whether he assigned any value to the basement in the as built, less than desirable, structure. He admitted that he did not assign a value to the basement space, and he also admitted that the basement obviously had value. He explained that he treated the basement as an "amenity," the amenity being "storage space" that was included in comparable sales that resulted in his valuation of the main floor at $100 per square foot rather than a lower figure. The cross-examination clarified the basis for the valuation of the hypothetical structure at $722,000. He based it upon comparable sales in the range of $160 to $180 per square foot and used $175 per square foot as the value per square foot of the hypothetical building. He then multiplied his value per square foot by a gross square footage of 4125, or the 2750 square feet of the ground floor plus 1375 square feet of the basement that were supposed to have been finished. Glascock admitted on cross-examination that in reaching his final diminished value of $447,000 he placed "great reliance" on an estimate the Owner provided him reflecting cost to repair of $456,000. When the attorneys finished with their questions, the court asked a few of its own "to make sure [it] understood."

The Court: . . . . In your report, you figured 4,125 square feet in order to come up with your 722 value?

The Witness: Yes.

The Court: And you figured the 2,750 square feet and come up with the 275 value?

The Witness: That's correct.

The Court: Okay. Which effectively, then, you didn't figure anything for basement space. And I heard your testimony as to why. But it did figure a half-finished basement space, fully usable basement space on the first?

The Witness: That's correct.

The Court: All right. If you had figured in that we just had unfinished basement space[,] . . . do you have a square foot figure on that?

The Witness: The per square foot figure for . . . a class A building with no deficiencies and had a completely wide open basement space would probably be more per square foot than my conclusions were for A. Let's say we had 2,750 square feet on both buildings.

\*     \*     \*

One . . . is well-built. One of them may have problems. The basements are wide open. On the well-built 2,750 square foot building without a basement, the value per square foot would, in my opinion, be greater than the $175 because you have a smaller building, and usually the smaller the building the greater the value per square foot. I would . . . estimate approximately $100,000 difference because of the half-finished basement.

So . . . if I were asked to appraise 2,750 square foot building, I would probably be in the mid $600 – 600,000 range. The finished basement adds probably another $100,000 to that, and

-6-

is based generally on what it would cost to – to have finished space in the basement.

So the number I came up with, $175, I'm saying, you know, really nice buildings out there are selling for more than two hundred dollars a foot; however, if I'm including the basement space in this I'd have to pull my value per square foot down to reflect that some of my space is not aboveground [sic] space.

Upon hearing the proof, the court rendered its memorandum opinion in favor of the Owner. The court noted that the construction cost of the building was approximately $460,000. The court also noted that the testimony regarding the cost of repair ranged "anywhere from the low $30,000 range, based upon the [Builder's] proof, all the way up to . . . exceeding $660,000 based upon the [Owner's] proof." However, the court effectively narrowed that range to exclude the Builder's proof when it rejected testimony on behalf of the Builder that the building could be repaired for $107,000. The court rejected the testimony because the testimony falsely assumed the building did not have substantial defects and because repairs of $107,000 would not bring the building up to code or even allow it to pass a building inspection. With regard to the proper measure of damages the court found:

The court adopts the Glascock appraisal as the court's proper measure to show the diminution in value damages. The court does not believe that the cost of repairs that would be required to repair this building are reasonable. The court specifically finds that the cost of repair is disproportionate when compared to the difference in the value of the structure actually constructed and the one contracted for. Therefore, the court finds the diminution in value is the proper measure of damages in this matter.

Despite adopting the Glascock appraisal, the court made some modifications to the appraisal based upon its understanding of the testimony.

Mr. Glascock pointed out, and the court agrees, that any potential buyer will not only want a dry building, they will require a dry building that is mold and mildew free. Otherwise, it would be extremely difficult, if not impossible, to market a healthcare facility building, and in this specific case, a dental office. Mr. Glascock's "type A" appraised value is $722,000. However, this was assuming the building had a fully completed

-7-

and usable basement area. After further questioning by the court, Mr. Glascock testified that the $722,000 value should be decreased by about $100,000 due to the value put on the basement in his "type A" value. Thus, the "type A" value should be $622,000. Mr. Glascock's "type B" value was $275,000. However, he placed no value for the basement space in his "type B" value. The court wishes to point out here that the court questioned the [Owner's] other expert witness, Ken True, a Tennessee licensed building contractor licensed and experienced in the building of dental offices a[s] to what the basement value would be and/or what a basement in a similar building would cost. The court also questioned the [Builder's] expert appraiser as to the basement value. The court finds the actual basement value to be $65,000, which should be added to Mr. Glascock's "type B" appraisal value, for a total of $340,000. Thus, the court finds Mr. Glascock's diminution in value damages to be $282,000.

The Owner moved the court to alter or amend the judgment to allow cost of repair damages or to allow diminution in value damages according to Glascock's report without modifications. The Owner also moved the court to allow substantial discretionary costs. Initially, the Owner did not file an affidavit in support of the motion for discretionary costs. The Builder responded that the court should deny the motion for discretionary costs for lack of a supporting affidavit. The Owner eventually submitted supporting affidavits, and the court allowed the parties significant time after the hearing on the motion to submit legal support for their positions. The court eventually entered a final order denying the motion to alter or amend and allowing discretionary costs of over $10,000 after allowing the Builder credits for amounts it had paid. The Owner has appealed.

II.

The issues in this appeal, as restated by this court, are:

Whether the evidence preponderates against the damages awarded for diminution in value.

Whether cost of repair or diminution in value was the proper measure of damages.

-8-

Whether the trial court erred in not requiring the Builder to reimburse the Owner for fees charged by the Owner's expert for copying and other services performed by the expert pursuant to the Builder's request during the expert's deposition.

Whether the trial court erred in awarding the Owner discretionary costs based on a motion that was not supported with an affidavit, but was later supplemented with supporting affidavits.

The last issue is raised by the Builder.

III.

The standard of review as to the measure and amount of damages was accurately stated as follows in *Faulkner v. Tom Emmett Const. Co.*, No. E2010-00361-COA-R3-CV, 2010 WL 4671008, at *7-8 (Tenn. Ct. App. E.S., filed Nov. 18, 2010).

> The factual findings of the Trial Court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. See Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn.2001). With respect to legal issues, our review is conducted "under a pure *de novo* standard of review, according no deference to the conclusions of law made by the lower courts." *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). In *Beaty v. McGraw*, 15 S.W.3d 819[, 827] (Tenn. Ct. App. 1998), this Court stated:
>
> > Determinations concerning the amount of damages are factually driven. *See Loftis v. Finch*, 491 S.W.2d 370, 377 (Tenn. Ct. App. 1972). Thus, the amount of damages to be awarded in a particular case is essentially a fact question. *See Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d 36, 42 (Tenn. Ct. App. 1995); *Buice v. Scruggs Equip. Co.*, 37 Tenn. App. 556, 571, 267 S.W.2d 119, 125 (1953). However, the choice of the proper measure of damages is a question of law to be

-9-

decided by the court. *See American Trust Inv. Co. v. Nashville Abstract Co.*, 39 S.W. 877, 881 (Tenn. Chan. App. 1896); *see also Business Men's Assurance Co. v. Graham*, 891 S.W.2d 438, 449 (Mo. Ct. App. 1994); *Town of Fifield v. State Farm Mut. Auto. Ins. Co.*, 119 Wis.2d 220, 349 N.W.2d 684, 686 (Wis. 1984).

Our *de novo* review is subject to the recognition that the trial judge saw and heard the witnesses and is in a better position than are we to evaluate the credibility of their testimony. *Keaton v. Hancock County Bd. Of Educ.*, 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003). "The party who takes issue on appeal with a trial court's decision regarding discretionary costs has the burden of demonstrating that the trial court abused its discretion." *Duran v. Hyundai Motor America, Inc.*, 271 S.W.3d 178, 215 (Tenn. Ct. App. 2008). A trial court's decision on a discovery matter will not be reversed unless a clear abuse of discretion is shown. *Benton v. Snyder*, 825 S.W.2d 409, 416 (Tenn. 1992).

IV.

We begin with the issue of whether the evidence preponderates against the trial court's finding that the diminution in value damages are $282,000. The Owner argues that having concluded that diminution in value was the correct measure of damages and having adopted Glascock's appraisal as the basis for its findings, the court erred in modifying Glascock's appraisal to reflect lesser damages. This equates with arguing that the evidence preponderates against interpreting Glascock's testimony to allow the downward adjustment of the value of the hypothetical "type A," *i.e.*, correctly-built, structure by $100,000 and the upward adjustment of the value of the actual "type B," *i.e.*, built-with-defects, structure by $65,000. We agree in part with the Owner's argument.

It is clear to us that the trial court misunderstood or misinterpreted Glascock's testimony when it stated that "[a]fter further questioning by the court, Mr. Glascock testified that the $722,000 value should be decreased by about $100,000 due to the value put on the basement in his 'type A' value." Glascock's testimony must be read with the understanding that he clearly explained during cross-examination how he valued the "type A" structure. He determined a per square foot value of $175 and multiplied it by 4,125 square feet. The 4,125 square feet is made up of 2750 square feet on the ground floor and 1375 square feet in the basement that was to have been finished. The product of $175 per square foot multiplied by 4,125 square feet is $721,875. The court's questions to Glascock were apparently prompted by concerns that Glascock did not assign value to the basement in the "type B" structure, the as-built structure. Unfortunately, the response spilled over into the "type A" structure. In

-10-

his attempt to respond to the questions, Glascock conceded that basement space would drive the overall per square foot value of a structure down below the per square foot value of a similar structure that did not have basement space, but that the basement space would still add value to the structure. In his attempt to relate his response to the facts of this case, Glascock explained that a building similar to Dr. Pesce's office but without defects and without a basement would probably be worth approximately $650,000 (approximately $240 x 2750), and then he would add, *not subtract*, approximately $100,000 for the basement. Both ways, according to Glascock, he essentially arrived at the same figure – somewhere above $700,000. The only reference to reducing the value for a basement in Glascock's testimony was that the inclusion of basement space drove the overall per square foot value of a given structure down below the per square foot value of an identical building without a basement. For the "type A" structure in the present case, the reduced figure was $175 per square foot that he ultimately used. It is clear to us that the trial court misunderstood Glascock's reference to the $100,000 and how it related to the comparison of structures built with basement space and structures built without basement space. Accordingly, we agree that the evidence preponderates against the trial court's modification of Glascock's appraisal of the "type A" structure by subtracting $100,000 to reduce the value of the structure to $622,000 from $722,000.

We disagree, however, with the Owner's contention that the evidence preponderates against the trial court's addition of $65,000 to Glascock's valuation of the as built, "type B" structure for the existence of basement space. Glascock admitted both during cross-examination and in response to directed questioning of the court that he did not assign independent value to the basement even though it clearly existed and clearly had value. The court mentioned in the course of questioning Glascock that it understood his explanation that he had treated the basement as an "amenity" that was included in the valuation of the ground floor at $100 per square foot. However, it is clear that the court did not wholeheartedly accept that part of Glascock's testimony. We note that the trial court gave Glascock ample opportunity to place a value on an unfinished basement but he did not. The trial court was in a better position than this court to evaluate the witness and his failure to give a direct answer to a direct question. *See* **Keaton**, 119 S.W.3d at 223. The evidence does not preponderate against the trial court's decision to assign an independent value to the "type B" structure for the existence of the basement.

Likewise, the evidence does not preponderate against the trial court's valuation of the existing basement at $65,000. The Owner criticizes the court for the court's statement that it questioned expert Thurman – this because Thurman did not appear in person but rather by deposition. The Owner also criticizes the court for taking a "basement" value from the testimony of Thurman after the court had stated that the Thurman appraisal was of no value to the court. Despite these criticisms we will not fault the trial court for taking one simple

figure, *i.e.*, the value of an unfinished basement, from the Thurman testimony. It appears to us that the reasons the court gave for rejecting Thurman's overall appraisal do not totally undercut his ability to place a value on an unfinished basement based on typical construction cost as a factor of square footage. We note that the Owner's expert, Eid, testified that it would cost approximately $60 per square foot to build a basement, which cost alone would exceed the value that the court assigned to the basement. Therefore, we conclude that the evidence does not preponderate against the trial courts modification of the Glascock appraisal by adding $65,000 to the "type B" building for the value of the basement. The result of our holdings as to diminution in value is a modification of the court's judgment. The $282,000 in damages awarded will be increased by $100,000 thereby correcting the trial court's erroneous interpretation of Glascock's testimony. Accordingly, we hold that the evidence preponderates in favor of a damage award of $382,000 based upon diminution in value.

The Builder argues that the evidence preponderates against a finding of damages in the amount of $282,000, a figure that we have now determined should have been $382,000. The argument is built upon select portions of the appraisals of the various experts, mainly Glascock and Thurman, combined in such a way as to produce a figure favorable to the Builder. The trial court's rejection of Thurman's appraisal and the correct adoption of Glascock's is not against the preponderance of the evidence. Having so held, we will not allow the Builder to selectively blend the two appraisals to produce a figure out of proportion to both appraisals. There is no merit to the Builder's argument.

The second issue is arguably impacted by the resolution of the first. The Owner asserts that "[c]hanging the amount of damages awarded by the Trial Court, may justify the Court using cost of repair as opposed to Diminution in Value as the proper measure of damages." As we understand the argument, the Owner is conceding that based on a finding that diminution in value was only $282,000 the trial court was correct to find that the cost of repair was disproportionate to diminution in value. However, the Owner is arguing that assuming this Court increases the diminution in value damages, which we have done, the cost of repair is no longer disproportionate and should become the correct measure of damages. We do not necessarily disagree with the logic of the argument, but we disagree that it changes the result in this particular case. Although we do not have the benefit of a specific finding as to the cost of repair, it is apparent that it would be close to, if not more than, the construction cost of approximately $460,000. If we were to make our own findings, we, like the trial court, would reject the modest cost of repairs asserted by the Builder's witnesses. Thus, the result of adopting cost of repairs as the measure of damages in this case would be to award the Owner as much in damages as he paid to have the structure built and leave him in possession of a fully operational, profitable, dental office. This result, we believe, renders cost of repairs disproportionate to any substantially lesser figure. Since diminution in value

damages of $382,000 are at least $80,000 less than cost of repair, we hold that the trial court did not err in selecting diminution in value damages as the proper measure of damages.

The Owner's final argument is that the trial court erred in not requiring the Builder to reimburse him for the fees charged by expert witness Eid. The Builder's brief is of little help on this issue. Without citing any authority, or mentioning the word "waiver," the Builder seems to argue that the Owner waived the issue by not giving the trial court an opportunity, after the order which reserved the issue for further hearing, to consider the issue. We disagree. In the first hearing on the motion to compel payment by the Builder of the fees and expenses charged by the expert, the trial court specifically found that there was an implied agreement that the Builder would pay the reasonable charges of the expert. The court awarded such amounts as had been paid, which related to the actual time spent in sitting for deposition, and specifically ordered further hearing on the issue of additional fees included in the expert's invoice. There were numerous parts of the record not sent up on appeal, including the transcript of the majority of the trial. Therefore, the record is unclear to us whether the matter was ever brought to the court's attention before the hearing on discretionary costs. Even if it was not, we do not believe it was too late at that juncture to have the hearing that had been ordered much earlier in the proceedings. We do not see any prejudice to the Builder, and the judgment had not yet become final because of pending post-trial motions. We also note that the trial court did not articulate a finding that the Owner had waived the right to reimbursement of the subject charges. Accordingly, we hold that the Owner did not waive the right to reimbursement of Eid's fees and expenses.

As to the merits of the claim to reimbursement, we read the transcript of the hearing and the orders to show that the trial court simply failed to appreciate that the claim was one more properly being asserted under Tenn. R. Civ. P. 26.02(4) than 54.04(2). The finding in the initial order on the issue of Mr. Eid's fees of an implicit agreement by the Builder to pay is entirely consistent with the language of Rule 26.02(4) with regard to the payment of testifying experts for their deposition: "Unless manifest injustice would result, . . . the court shall require that the party seeking discovery pay the expert a reasonable fee for time spent in responding to discovery [of an expert witness expected to testify at trial]." Thus, we hold that the trial court erred in denying the request altogether. We are not holding that any and all charges recorded on the invoice are chargeable to the Builder any more than we are holding that any particular charge is not to be charged to the Builder. On remand, the trial court is directed to hold a hearing and, in the exercise of its discretion based on suitable and necessary findings, order the Builder to reimburse the Owner for such charges of expert Eid as are just.

The final issue is the one stated by the Builder, *i.e.*, whether the court erred in awarding discretionary costs when the motion was made without supporting affidavits. We

interpret the Builder's argument as an all or nothing challenge to discretionary costs in any amount and not a challenge to any one component of the award. We hold that the trial court did not err in considering the affidavits submitted after the motion. The present version of the applicable rule, 54.04(2)[1], does not explicitly require that the motion be accompanied by an affidavit or affidavits. All it requires, on its face, is that "a party requesting discretionary costs . . . file and serve a motion within thirty (30) days after entry of judgment." Tenn. R. Civ. P. 54.04(2). Case law has held that the motion should be supported by an affidavit so as to allow the court to make the findings required for an award of discretionary costs. *See, e.g.*, ***Waggoner Motors, Inc. v. Waverly Church of Christ***, 159 S.W.3d 42, 65 (Tenn. Ct. App. 2004). By the time the court ruled on the Owner's motion in this case, it had the benefit of the required affidavits. Although the Builder complains that the affidavits were filed only approximately three days before the hearing, the Builder has not shown how it was prejudiced by the belated filing, nor does it indicate that it asked the court for additional time to counter the affidavits. We note that the trial court specifically recited in an order that it wanted to "get it right" on this issue and allowed the parties additional time after the hearing to file legal argument and authority. We will not assume that the trial court would have overlooked a request for a continuance to overcome prejudice to the Builder. Accordingly, we hold that the trial court did not err in awarding discretionary costs based on affidavits filed after the motion for discretionary costs was filed and within a few days of the hearing on the motion.

---

[1] A previous version of Rule 54.04(2), as quoted in ***Lock v. National Fire Ins. Co. Of Pittsburgh, Penn.***, 809 S.W.2d 483 (Tenn. 1991), stated, in pertinent part:

> A party who desires to recover discretionary costs or any recoverable costs
>
> not included in the bill of costs prepared by the clerk of the trial court shall move the court to assess discretionary costs and attach thereto an itemized and verified bill of costs. The affidavit shall be made by the party or his duly authorized attorney or agent having knowledge of the facts, certifying that such items of costs are accurate and were reasonable and necessary to preparation and trial of the case and that the services for which such fees have been charged were actually performed.

*Id*. at 489.

V.

The judgment of the trial court is reversed in part and affirmed in part as modified. That part of the judgment denying the Owner reimbursement for the fees and expenses charged by expert Eid is reversed. The award of damages of $282,000 based on diminution in value is increased by $100,000 to $382,000. Costs on appeal are taxed to the appellee, East Tennessee Construction Services, Inc. This case is remanded, pursuant to applicable law, for a hearing to determine the amount of the reimbursement to the Owner for Eid's fees and expenses related to his deposition; for enforcement of the judgment as modified; and for collection of costs assessed by the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE